641 P.2d 1070

**James W. SEWELL, M.D., Plaintiff-Appellant,**

v.

**John N. WILSON, M.D., B. S., Bhati, M.D., Edward J. Gerety, M.D., individually, Surgical Associates, a professional association, and Presbyterian Hospital Center, a corporation, Defendants-Appellees.**

**No. 5160.**

Court of Appeals of New Mexico.

Jan. 26, 1982.

Writ of Certiorari Denied Feb. 26, 1982.

F. Joel Roth, Ronald J. Van Amberg, Roth, Van Amberg & Gross, Santa Fe, for plaintiff-appellant.

W. Robert Lasater, Jr., Rodey, Dickason, Sloan, Akin & Robb, Thomas J. McBride, Johnson & Lanphere, Albuquerque, for defendants-appellees.

## OPINION

DONNELLY, Judge.

Plaintiff, James W. Sewell, M.D., appeals from a district court order dismissing his medical malpractice complaint with prejudice for failure to prosecute pursuant to N.M.R.Civ.P. 41(e), N.M.S.A.1978. Alleging negligent post-operative care of plaintiff, the complaint named as defendants, Dr. Wilson, Bhati, Gerety; their employer, Surgical Associates, P. S.; and Presbyterian Hospital Center. Two issues were raised on appeal: whether the trial court abused its discretion in dismissing plaintiff's complaint, and if not, whether defendants waived their right to dismissal.

The events that gave rise to this action began in January, 1975, when defendant surgeons performed coronary bypass surgery upon plaintiff. Since then he has suffered from vertigo (dizziness and nausea), ataxia (loss of motor coordination), and hearing loss. Plaintiff alleges that these permanently debilitating conditions are due to defendants' negligent post-operative prescription and administration of antibiotic gentamicin and other drugs, contraindicated in plaintiff's case. Defendants denied these allegations.

On January 19, 1976, plaintiff filed his complaint. In February and March, 1976, separate answers of Presbyterian Hospital and defendant doctors were filed. Plaintiff filed a jury demand in March, 1976.

From the time the complaint was filed, through October, 1977, plaintiff and defendants conducted extensive discovery. In 1976, plaintiff propounded and received answers to interrogatories from defendant Hospital. That same year, plaintiff received 124 interrogatories from defendant Hospital and returned a 48-page response.

Three months after accepting employment in 1977, plaintiff's substituted attorneys began to arrange for depositions. Also during 1977, plaintiff requested and obtained nine separate sets of his medical records, propounded four separate sets of interrogatories, and received some answers, took four separate depositions totaling 451 pages, and was deposed himself by defendants.

Thereafter, plaintiff and his attorney attempted to locate an expert witness to testify on plaintiff's behalf. Correspondence, comprised of 16 letters written between February, 1978, and August, 1979, partially document this search. Plaintiff's attempts to locate an expert medical witness included negotiations to enlist the aid or association of an Arizona law firm. This entailed the Arizona firm's review of the depositions and medical records.

On August 13, 1979, defendants filed a motion to dismiss for lack of prosecution, to which plaintiff responded by memorandum brief on August 29, 1979. Plaintiff then moved for a trial setting on January 25, 1980. On February 4, 1980, defendant hospital filed interrogatories directed to plaintiff, followed by a motion to compel answers on February 26, 1980, to which plaintiff responded two days later. On March 3, 1980, plaintiff filed answers to the interrogatories with attachments, totaling 36 pages. Later in March, 1980, defendants separately filed motions for summary judgment on the merits. In December, 1980, defendant doctors filed an additional affidavit from a medical expert in support of summary judgment. Hearing dates on the motion for summary judgment were repeatedly set and vacated. The motion was finally heard on January 29, 1981. On the same date, the court heard argument on the motion to dismiss for failure to prosecute, 17 months after it had been filed.

In his response to the motion to dismiss, plaintiff incorporated by reference a complaint, answers, jury demand, interrogatories, deposition notices and depositions, all on file with the court, as well as his affidavit, together with attached exhibits. At the

hearing on the motion, defendants' counsel stipulated to all portions of the affidavit that would have been admissible under the rules of evidence if offered at the hearing by plaintiff's testimony.

The response, affidavit, exhibits, and depositions further detail plaintiff's activities and attempts to bring his case to final termination through August, 1979. At first, plaintiff believed his symptoms were due to pre-existing ear disease.

In March, 1975, plaintiff underwent ear surgery intended to correct a suspected source of his symptoms. As a result of the surgery, plaintiff suffered extensive hearing loss, but no improvement in his vertigo and ataxia. He then noticed that the Physicians' Desk Reference, the medication reference text used in the medical profession, indicated that the drugs administered to him after cardiac surgery may have been inappropriate in his case.

Subsequently, plaintiff consulted an Albuquerque neurologist. In his examination report, the neurologist said of the vertigo and ataxia, "I would be surprised if it is a result of a sudden exacerbation of his middle ear disease during surgery.... I think a reasonable possibility is that his ataxia may be related to gentomycin oto toxicity [sic]...." Plaintiff then filed suit. After learning of the suit, the neurologist changed his opinion and sent a letter to defense counsel stating that additional information in plaintiff's records led him to the conclusion that plaintiff's symptoms were due to pre-existing ear disease.

Thereafter, plaintiff encountered difficulty in finding a doctor who was willing to testify that negligent prescription of drugs caused his condition. The record indicates that plaintiff saw at least nine doctors between 1975 and 1979. In his affidavit, plaintiff stated that it was necessary to visit these physicians in person, requiring trips to Albuquerque, Texas, Colorado and California. In 1977, plaintiff found two physicians outside of New Mexico who believed that his symptoms were due to the drugs administered by defendants, but by 1979, plaintiff was still unable to find a

medical expert who was willing to testify that the administration of the drugs was negligent. One doctor examined plaintiff and then refused to respond to plaintiff's requests for a report of findings until one year later, when the doctor merely sent plaintiff a copy of his records. Plaintiff contacted at least four more physicians during 1978 and 1979. Finally, on January 19, 1981, plaintiff obtained the affidavit of a California specialist in industrial and forensic otology. The specialist stated that, in his medical opinion, plaintiff's vertigo, ataxia, and hearing loss were due to defendants' post-operative prescription and administration of drugs, which was contrary to medical standards of conduct, and the degree of skill and care that should be met by an average medical practioner anywhere.

Also, during this time, plaintiff was undergoing treatment and surgery to correct his hearing loss. In addition to the 1975 operation in Albuquerque, ear surgery was performed upon plaintiff in 1975 in Colorado and in 1978 in California. Plaintiff stated in his affidavit that the travel required in his search for an expert and treatment of his deafness was difficult for him. Movement exacerbated his vertigo and ataxia to the point that he was disabled. To cover travel and medical expense and to support his family, plaintiff had to continue his own family practice of medicine in Springer, New Mexico. In addition, this required that he complete 60 hours per year of continuing medical education necessitating attendance at programs in other states.

Because of these facts, plaintiff's first point on appeal asserts that the trial court abused its discretion in dismissing his complaint for failure to prosecute under N.M.R. Civ.P. 41(e).

I. *Propriety of Dismissal:*

In applicable part, Rule 41(e) provides: (e) Dismissal of action with prejudice. (1) In any civil action * * *, when it shall be made to appear to the courts that the plaintiff therein * * * has failed to take any action to bring such action or proceeding to its final determination for a

period of at least three years after the filing of said action or proceeding * * * unless a written stipulation signed by all parties to said action or proceeding has been filed suspending or postponing final action therein beyond three years, any party to such action or proceeding may have the same dismissed with prejudice * * *.

In *State ex rel. Reynolds v. Molybdenum Corp. of America*, 83 N.M. 690, 496 P.2d 1086 (1972), the Supreme Court established new standards for application of the rule that are controlling in this case. Prior decisions, noted and overruled in *Reynolds*, strictly applied Rule 41(e) as a statute of limitations. Under the strict application, the trial court had no discretion except to dismiss unless the court file itself showed diligent prosecution. Time was tolled by excusable failure to serve process or by statute, or plaintiff was unable to bring the case to trial for some other good reason beyond his control. "Action to bring" a suit to its final termination became equated with "required pre-requisites to trial." The court in *Reynolds* criticized these earlier cases, and held:

The rule contemplates a hearing upon a motion to dismiss at which the parties may present evidence on the issue of whether ' * * * the plaintiff therein * * has failed to take any action to bring such action or proceeding to its final determination for a period of at least three [3] years after the filing of said action or proceeding * * *.'

The trial court should determine, upon the basis of the court record and the matters presented at the hearing, whether such action has been timely taken by the plaintiff, * * * and, if not, whether he has been excusably prevented from taking such action. In making this determination, the discretion of the trial court will be upheld on appeal except for a clear abuse thereof.

An abuse of discretion in this context occurs "when the court exceeds the bounds of reason, all the circumstances before it being considered." *Dunham-Bush, Inc. v.*

*Palkovich*, 84 N.M. 547, 505 P.2d 1223 (1972). *Reynolds* never addressed whether any particular circumstances present a minimum threshold of activity under the rule. In *Martin v. Leonard Motor-El Paso*, 75 N.M. 219, 402 P.2d 954 (1965), cited with approval in *Reynolds*, the court stated, "we make no attempt to fix a standard of what action is sufficient to satisfy the requirement of the rule, for each case must be determined upon its own particular facts and circumstances."

Although no specific minimum of activity is required, the *Reynolds* court objected to the strict interpretation of Rule 41(e) because:

The trial court was required to ignore all written and oral communications between the court and counsel * * *; actual hearings * * *; negotiations and other actions between counsel for the parties looking toward the early conclusion of the case, * * *; all discovery proceedings by way of depositions on oral examination or written interrogatories, discovery and production of documents and things, mental or physical examinations of persons, and requests for admission of facts and genuiness of documents * * *, unless record thereof was made and placed in the court file.

Implicitly, *Reynolds* requires consideration of such activities.

Defendants argue that even under the *Reynolds* test, plaintiff's actions were insufficient and inexcusable to prevent dismissal for failure to prosecute. Defendants are correct in their assertion that initiation of discovery proceedings does not necessarily demonstrate the diligence required of plaintiff because such activity is routine and almost reflexive in modern litigation. Indeed, in *Carter Farms Co. v. Hoffman-LaRoche, Inc.*, 91 N.M. 132, 571 P.2d 124 (Ct.App.1977), this court affirmed a Rule 41(e) dismissal where the only action taken during the three year period was submission of and hearing on plaintiff's interrogatories.

Although discovery is not a minimum threshold under the rule, it is an im-

portant consideration. Criticizing a prior case which held that discovery procedures do not toll Rule 41(e) because they are not "required prerequisites to trial," the court in *Reynolds* stated:

> We find nothing in Rule 41(e), * * * equating 'required prerequisites to trial' with 'action to bring' a suit to its final determination, and we are unable to understand why the use of discovery proceedings 'are not actions to bring a proceeding to its final determination.'

The discovery proceedings in this case are easily distinguishable from the single interrogatory filed in *Carter, supra.* The depositions, interrogatories, and answers filed before the motion to dismiss herein, exceed 685 pages. Moreover, the discovery in this case must be considered in light of the other activities revealed in the record.

Plaintiff argues that his difficulty and attempts to find a competent medical expert to testify amounted to sufficient action to bring the case to its final determination, and, if not, amounted to a justifiable excuse preventing him from bringing the case to final determination, under the *Reynolds* test. Defendants respond that plaintiff's search for a medical witness was desultory and more characteristic of pre-complaint research than action in pursuit of concluding litigation contemplated in *Reynolds.*

Plaintiff's search for an expert witness was neither desultory nor a mere belated attempt to determine whether a claim existed. Before he filed suit, he obtained a tentative opinion partly in support of his malpractice claim from the Albuquerque neurologist who subsequently changed his mind. Plaintiff also found support for his claim in the warnings of Physician's Desk Reference.

■ Plaintiff's search for an expert witness may seem unnecessary because, theoretically, as a physician, he could have given the requisite expert testimony himself. Expert testimony as to standards of medical care is not mandatory in some medical malpractice cases, although such testimony is required if the alleged negligence is in an area peculiarly within the knowledge of physicians. *Pharmaseal Laboratories, Inc. v. Goffe,* 90 N.M. 753, 568 P.2d 589 (1977). Where expert testimony is required, the mere fact that a medical witness is not a specialist goes to the weight, not to admissibility, of the witness' expert testimony. *Frederick v. Younger Van Lines,* 74 N.M. 320, 303 P.2d 438 (1964); cf. *Griego v. Grieco,* 90 N.M. 174, 561 P.2d 36 (Ct.App.), (Wood, C. J., and Hendley, J. specially concurring), *cert. denied,* March 15, 1977. Nevertheless, to give scientific or specialized opinion testimony, an expert witness must be qualified to do so by knowledge, skill, training or education. N.M.R.Evid. 702, N.M.S.A.1978; *see, Gandara v. Wilson,* 85 N.M. 161, 509 P.2d 1356 (Ct.App.1973); *Dahl v. Turner,* 80 N.M. 564, 458 P.2d 816, 39 A.L.R.3d 207 (Ct.App.), *cert. denied,* 80 N.M. 608, 458 P.2d 860 (1969). A medical expert must also be able to testify as to how and why he arrives at an opinion that a defendant physician's conduct has been substandard. *Smith v. Klebanoff,* 84 N.M. 50, 499 P.2d 368 (1972), *cert. denied,* 84 N.M. 37, 499 P.2d 355 (1972). Thus, a non-specialist can testify as to the standards of care owed by a defendant specialist, but only if the non-specialist is qualified and competent to do so. *Harold v. Radman,* 31 Md.App. 184, 355 A.2d 477 (Ct. Spec.App.1976), *aff'd in part,* 279 Md. 167, 367 A.2d 472 (1977); *Swanson v. Chatterton,* 281 Minn. 129, 160 N.W.2d 662, 31 A.L.R.3d 1152 (1968).

■ Expert testimony was necessary to the proper presentation of plaintiff's case. At oral argument, counsel stated that plaintiff did not feel competent to testify as an expert as to the standard of care applicable to defendants' administration of ototoxic medication. Moreover, if he were competent as an expert, his testimony would be so biased that it would carry little, if any, weight before the trier of fact. In all practicality, he could not proceed to trial without finding another physician to testify.

A review of all of the evidence in the record on appeal indicates that plaintiff's search for such an expert was not desultory or unreasonable.

The "strict locality rule," defining the prerequisite proof to recovery in medical malpractice cases, changed during the pendency of plaintiff's suit. In September, 1977, *Pharmaseal Laboratories, Inc., v. Goffe, supra*, held in part that liability of a physician was no longer predicated on departure from the standards of medical care *in the community*, but rather on departure from standards of medical practice *under similar circumstances*. Thus, plaintiff's search began its full reach outside of New Mexico after suit was filed.

■ At oral argument before both the trial court and this court, plaintiff's counsel stated that an unsuccessful attempt had been made to obtain a medical witness through the medical-legal panel established under §§ 41–5–1 to –28, N.M.S.A.1978 to aid in locating expert medical witnesses for valid malpractice claims. Plaintiff stated that his further search required personal visits and examinations by consulting doctors. These activities fall within the scope of factors to be considered as action to bring a proceeding to its final determination. The record demonstrates almost continual activity by plaintiff in locating a medical expert, with no gap of inactivity longer than a few months.

Coupled with the extensive discovery that occurred at the outset of the litigation, plaintiff's search for a witness showed diligence in pursuit of his claim.

Even prior to *Reynolds*, existence of good cause excuse for failure to prosecute constituted grounds to prevent dismissal. In *Ringle Development Corp. v. Chavez*, 51 N.M. 156, 180 P.2d 790 (1947), the court, holding dismissal for failure to prosecute mandatory, expanded and defined the concept of excuse. The court quoted *Christin v. Superior Court*, 9 Cal.2d 526, 71 P.2d 205, 112 A.L.R. 1153 (1937), and recognized that an exception exists where:

> [F]or all practical purposes, going to trial would be impossible, whether this was because of a total lack of jurisdiction in the strict sense, or because proceeding to trial would be both impracticable and futile. In this connection, a useful analogy

may be drawn from the rules on impossibility as a defense in the enforcement of contract obligations. Modern cases recognize as a defense not only objective impossibility in the true sense, but also impracticability due to excessive or unreasonable difficulty or expense.

It would have been futile for plaintiff in the instant case to go to trial without a competent expert. Delay due to difficulties in finding an expert medical witness has been considered as a factor in a motion to dismiss for failure to prosecute. *Poluka v. Cole*, 222 Pa.Super. 500, 295 A.2d 132 (1972); *see Richman v. General Motors Corp.*, 437 F.2d 196 (1st Cir. 1971). Travel was necessary to find an expert, but it was expensive, physically disabling, and an obstacle to plaintiff in maintaining his own medical practice. We cannot expect a plaintiff to devastate his career, health and financial condition before he can obtain redress for an alleged tort.

Other courts have considered change of counsel, illness, conduct of negotiations, and willingness to go to trial as factors to be considered in determining whether failure to prosecute was excuseable. See *Jarva v. United States*, 280 F.2d 892 (9th Cir. 1960), *Price v. Sunfield*, 57 Ariz. 142, 112 P.2d 210 (1941); *Cervi v. Town of Greenwood Village*, 147 Colo. 190, 362 P.2d 1050 (1961).

In the instant case, the nature of discovery required the demonstrated difficulty, expense and physical disability in conducting the search for an expert, plaintiff's physical condition, the surgery and treatment of plaintiff's deafness, and the setbacks due to changes in attorneys and initial requirement of the strict locality rule, all together constituted such factors as would have rendered trial on the merits futile.

Defendants claim that they have been prejudiced by the delay because of a change in plaintiff's recollection. Plaintiff now recalls receiving two injections of gentamicin where previously recalled receiving only one. Defendants claim a possible inability to marshall evidence to contradict plain-

tiff's more recent recollection due to lapse of time. We fail to see how or why this factor prejudices defendants. The amount of the drug administered was always an issue. It is not uncommon that recollection of witnesses change, and rules of evidence contemplate this. *See* N.M.R.Evid. 801(d)(1)(A), N.M.S.A.1978.

Defendants argue that justification for dismissal is enhanced where prejudice to defendants has been shown because "the law presumes injury from unreasonable delay." *States Steamship Co. v. Philippine Air Lines,* 426 F.2d 803 (9th Cir. 1970). But no more time had elapsed between the alleged act of malpractice and plaintiff's motion for a trial setting than would have elapsed if plaintiff had waited until the three-year statute of limitations, § 41–5–13, N.M.S.A. 1978, was about to run, filed his complaint, and then waited another three years before requesting a setting. Moreover, in *Gaston v. Hartzell,* 89 N.M. 217, 549 P.2d 632 (Ct.App.1976), this court construing a statute of limitations stated the policy that:

> 'Where choice must be made between the defendants' problems of lost evidence, faded memories, and missing witnesses, on the one hand, and a deprivation to the plaintiff of any and all remedy for the wrong done * * *, the law must be construed in favor of the blamelessly ignorant plaintiff and against the interests and convenience of the wrongdoer.' *Layton v. Allen,* 246 A.2d 794, 799 (Del.1968).

As noted in *Reynolds,* Rule 41(e) "is intended to promote judicial efficiency and to conclude stale cases, but it should not be applied in complete disregard of this court's often stated concerns for the rights of litigants to have their day in court and their cases decided on the merits and not on trivial technicalities."

 An adjudication on the merits was possible by the time defendants' motions to dismiss were heard, as plaintiff had by then moved for a trial setting. Under *Reynolds,* "The movant must also be diligent, and actions taken prior to the filing of the motion to dismiss must be considered as timely." Although the request for a trial setting in this case was filed after the motion to dismiss, it should be considered in determining the propriety of the dismissal. This is not to say that a plaintiff can avoid dismissal by racing to the courthouse with a setting request after defendant has moved under Rule 41(e). But a court may, in its discretion, consider as timely, activities occurring between the filing of the motion and the hearing on it. *See Hurt v. Cambridge,* 21 Mich.App. 652, 176 N.W.2d 450 (1970); *Poluka v. Cole, supra.*

 In the instant case, plaintiff clearly demonstrated almost continual activity in pursuit of his claim and sufficient excuse for failure to attempt to conclude it with any greater dispatch. By the time the motion to dismiss was heard, more than 1,000 pages of record had been developed, one-third of which accumulated during the 17 months after the motion was first filed. We do not imply that undertaking discovery, pursuit of or delay in finding an expert witness, physical disability of a plaintiff, economic difficulty or the need to travel, in and of themselves if taken individually would constitute sufficient action or excusable delay in bringing a case to final determination within the time constraints of Rule 41(e), *supra.* Nevertheless, dismissal of plaintiff's complaint under the facts of this case amounted to an abuse of discretion in light of the policies behind Rule 41(e) and the combination of facts in this case, including plaintiff's willingness to set a trial date before defendants' motions were heard.

Abuse of discretion has been found where dismissal results in an injustice and special circumstances impeded plaintiff's prosecution of his claim, or where a claim is being pursued actively after a prior lapse in activity. *Brown v. State,* 526 P.2d 1365 (Alaska 1974); *Laurie v. Ezard,* 595 S.W.2d 336 (Mo. Ct.App.1980). While the factors discussed above do not individually constitute sufficient activity or excuse, cumulatively they provide sufficient reason to permit plaintiff to proceed with his claim. There is no reason to bar plaintiff from an adjudication

on the merits. Discretion must be used in conformity with the spirit of the law which is but served by giving litigants a chance to be heard when possible. *Laurie v. Ezard, supra.*

II. *Waiver of Right to Seek Dismissal*:

Plaintiff also asserts that defendants waived their right to dismissal by action taken after filing the motion. We need not reach this point. We have found plaintiff's first point on appeal meritorious.

Plaintiff's case should not have been dismissed. The order of the trial court is reversed. This case is remanded to the trial court with directions to set aside the order of dismissal and for further proceedings consistent with this opinion. Plaintiff is awarded costs of this appeal.

HENDLEY and SUTIN, JJ., concur.