IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date: September 15, 2016

**NO. 34,269**

**PETER WIRTH, ESQ., as Personal Representative of the ESTATE OF INEZ MARTINEZ,**

Plaintiff-Appellee,

v.

**SUN HEALTHCARE GROUP, INC., SUNBRIDGE HEALTHCARE, LLC, PEAK MEDICAL, LLC, and PEAK MEDICAL ASSISTED LIVING, LLC d/b/a THE VILLAGE AT NORTHRISE,**

Defendants-Appellants.

**APPEAL FROM THE DISTRICT COURT OF SANTA FE COUNTY**
**Francis J. Mathew, District Judge**

Curtis & Lucero
Lisa K. Curtis
Amalia S. Lucero
Albuquerque, NM

Tucker Law Firm P.C.
Steven L. Tucker
Santa Fe, NM

for Appellee

Quintairos, Prieto, Wood & Boyer, P.A.
Frank Alvarez
Kristin McLaughlin
Dallas, TX

Rodey, Dickason, Sloan, Akin & Robb, P.A.
Edward Ricco
Jocelyn Drennan
Albuquerque, NM

for Appellants

# OPINION

**VANZI, Judge.**

{1}     The decedent in this wrongful death lawsuit was Inez Martinez, a resident at the Village at Northrise (VNR), which is a skilled nursing facility. The only remaining Defendants are Peak Medical Assisted Living, LLC (PMAL)—doing business as VNR—and three upstream entities in its ownership chain, which Plaintiff (as personal representative for Martinez) has alleged are joint venturers and co-employers of the staff at VNR. At the close of a six-day jury trial, the district court directed verdicts for Plaintiff on theories of negligent operation of a facility and negligence per se. The jury then found that at least one of those theories of negligence caused Martinez's death.

{2}     Since the jury also found that Defendants were joint venturers and co-employers, the court entered judgment against all four entities, jointly and severally. The court then awarded interest under NMSA 1978, Section 56-8-4(B) (2004), which allows a discretionary award of prejudgment interest of up to 10 percent from the date the complaint is served when a defendant fails to make a reasonable and timely settlement offer. This appeal challenges the underlying directed verdicts, the submission of the joint venture and co-employment issues to the jury, and the assessment of prejudgment interest. We affirm with respect to PMAL, which is liable

for the negligent acts or omissions of its employees. But we set aside the judgment against the other defendants and remand for a corresponding reassessment of prejudgment interest.

**BACKGROUND**

{3} On April 15, 2010, Inez Martinez, age 82, was admitted to VNR where she was to recuperate from pacemaker implantation surgery for an anticipated stay of twenty days. She was discharged on May 5, 2010, by order of her attending physician, Dr. Guadencio Pavia, who was credentialed to see patients at the facility. Martinez died shortly thereafter as a result of sepsis caused by a wound infection (staph) at her incision.

{4} Dr. Pavia never examined Martinez's incision during her stay at VNR, and it was later revealed at trial that attending physicians were not required to come to the facility to see their patients. To be sure, Martinez did see physicians on two occasions: first on April 23, when her cardiologist found that her incision was healing well, and again on May 3, when she met with Dr. Pavia at his office and was cleared for discharge. But by all accounts, Dr. Pavia ordered Martinez's discharge without even removing her bandage, making that off-site meeting effectively useless for diagnosing a wound infection, even if early symptoms would have been manifest on May 3.

2

{5}     On May 4, after the off-site meeting but prior to discharge, a nurse at VNR noted "scabbed pus" around Martinez's incision. The nursing staff applied antibiotic ointment, covered the incision with sterile gauze, and notified Dr. Pavia by fax of what had been observed and what had been done. Dr. Pavia signed the fax, presumably indicating that he read it; but he did not modify his discharge order, he left no instruction for the nursing staff, and—in accordance with his normal practice—he did not come to the facility to see his patient.

{6}     The next day, Martinez complained of a "[m]oderate, severe pain" that was progressing from the site of her pacemaker to her left shoulder. This time without notifying Dr. Pavia, staff administered two doses of narcotic pain medication and discharged Martinez from the facility pursuant to Dr. Pavia's May 3 order.

{7}     Once home, Martinez's condition rapidly deteriorated. She was hospitalized with a wound infection that had become septic. She received aggressive treatment, but her symptoms worsened: she developed stress ulcers, hypoxemia, liver damage, and kidney failure. Martinez died at the hospital—thirty-one days after her admission to VNR.

{8}     The administrator at VNR, who was employed by PMAL, should have required attending physicians, including Dr. Pavia, to come to the facility to see their patients. Experts for both sides agreed that the failure to do so fell below the standard of care

3

applicable to a skilled nursing facility. But the evidence conflicted as to whether signs of a wound infection were apparent on May 4 and 5, raising a question whether the result would have been any different had Martinez been examined by her physician before discharge.

{9}     Thus, based on the experts' opinions, Plaintiff moved for directed verdict on a theory of negligent operation of the facility with the understanding that the jury would still have to determine whether the failure to require Dr. Pavia to visit Martinez at the facility caused her death. Plaintiff also moved for directed verdict on a closely related theory of negligence per se, arguing that the facility had violated both a federal and a state regulation.

{10}     The federal regulation, 42 C.F.R. § 483.75(h) (2014), is part of a complex scheme of conditions that nursing homes must meet to participate in medicare and medicaid programs. *See* 42 C.F.R. § 483.1(b) (2015). Its somewhat cryptic language requires a nursing home to either employ a qualified professional to furnish a specific service to residents or to

> have that service furnished . . . by a person or agency outside the facility under an arrangement . . . [that] must specify in writing that the facility assumes responsibility for . . . [o]btaining services that meet professional standards and principles that apply to professionals providing services in such a facility[.]

42 C.F.R. § 483.75(h)(1), (2)(i).

{11} The state regulation, 7.9.2.37(A), (C)(1) NMAC, requires that a physical examination be conducted within forty-eight hours on persons admitted to nursing homes, except those admitted for short-term care. Although it was undisputed at trial that Martinez was expected to stay at VNR for twenty days, and that no physician examined her within forty-eight hours of her admission, there was no testimony about the meaning of the short-term care exception. "Short-term care" is not defined in the regulations, and the parties have not cited any authority defining the term, nor pointed to any case interpreting it.

{12} The district court ultimately granted the directed verdict motions. Because causation was still at issue, the directed verdicts did not determine liability. They only resulted in a jury instruction that Defendants had been held negligent as a matter of law in all three respects, and that the jury could return a verdict for Plaintiff if it found that any such negligence was a cause of Martinez's death. Accompanying that instruction was a verdict form that accordingly asked, "Do you believe that any of these acts of negligence by . . . Defendants were a cause of injury and damage [to] Martinez?" Without any further specification, the jury marked "[y]es."

{13} Defendants twice moved for a directed verdict on Plaintiff's theories of joint venture and co-employment. The district court denied Defendants' motions, and the jury found that all Defendants were joint venturers and co-employers of the staff at

5

VNR. Upon finding causation, the jury returned a verdict for Plaintiff awarding compensatory damages of $2.5 million. The court then agreed with Plaintiff that Defendants' only settlement offer of $250,000 was unreasonable. It awarded prejudgment interest at 8 percent per annum in the total amount of $334,246.57.

{14} Defendants now make several arguments, some of which were not made below. To the extent their arguments were not preserved, they invoke the doctrine of fundamental error, which they recognize applies in civil cases in only "the most extraordinary and limited circumstances." *See Estate of Gutierrez ex rel. Jaramillo v. Meteor Monument, L.L.C.*, 2012-NMSC-004, ¶ 33, 274 P.3d 97. They assert, first, that directing a verdict on the negligent operation theory was error because expert opinions—even when unanimous—are not binding on the jury. That is, since our case law allows juries to reject expert testimony, *see, e.g., State v. Moore*, 1938-NMSC-007, ¶ 73, 42 N.M. 135, 76 P.2d 19, the directed verdict on the negligent operation claim must have been improperly based on the district court's decision to accept the testimony, and not the jury's.

{15} Defendants also argue that it was error to direct verdicts based on the federal and state regulations because the federal regulation does not set forth a specific standard of conduct distinct from the medical negligence standard of care, *see Heath v. La Mariana Apartments*, 2008-NMSC-017, ¶ 9, 143 N.M. 657, 180 P.3d 664, and

the state regulation, by its terms, does not apply to short-term care. Since the verdict form does not reveal which theory the jury found to be causative, Defendants argue that a new trial is required if any directed verdict was improperly granted. *See Bachicha v. Lewis*, 1987-NMCA-053, ¶ 16, 105 N.M. 726, 737 P.2d 85 ("[W]here we cannot tell whether the jury based its verdict upon an improperly submitted issue, the proper procedure is to reverse and remand for a new trial on all issues.").

{16} With respect to joint and several liability, Defendants contend that the evidence showed nothing more than the degree of control normally incident to a chain of ownership in a legitimate corporate structure. In a parent-subsidiary relationship, "[t]he parent has control over the subsidiary . . . by its ownership of a majority or all of the stock therein[,]" and it can generally be held vicariously liable for the subsidiary's acts only by piercing the corporate veil. *Scott v. AZL Res., Inc.*, 1988-NMSC-028, ¶ 6, 107 N.M. 118, 753 P.2d 897. Defendants argue that it was improper to circumvent veil-piercing by submitting questions of joint venture and co-employment to the jury. In the event their other arguments are unsuccessful, Defendants argue that the district court should not have awarded prejudgment interest at a "highly punitive" rate of 8 percent.

{17} We review de novo the grant or denial of a motion for directed verdict. *McNeill v. Burlington Res. Oil & Gas Co.*, 2008-NMSC-022, ¶ 36, 143 N.M. 740, 182 P.3d

7

121. We review an award of prejudgment interest for an abuse of discretion. *Behrens v. Gateway Court, LLC*, 2013-NMCA-097, ¶ 25, 311 P.3d 822, *cert. quashed*, 2014-NMCERT-010, 339 P.3d 426.

**DISCUSSION**

**The Negligent Operation Claim**

{18} A directed verdict is proper when "the facts and inferences are so strongly and overwhelmingly in favor of the moving party that the judge believes that reasonable people could not arrive at a contrary result [and] . . . when there are no true issues of fact to be presented to a jury[.]" *Rist v. Design Ctr. at Floor Concepts*, 2013-NMCA-109, ¶ 7, 314 P.3d 681 (internal quotation marks and citations omitted). That standard applies notwithstanding the rule—cited by Defendants for the first time on appeal—that "[t]he judgments of experts . . . , even when unanimous and uncontroverted, are not necessarily conclusive on the jury, but may be disregarded by it." *State v. Alberico*, 1993-NMSC-047, ¶ 36, 116 N.M. 156, 861 P.2d 192 (internal quotation marks and citation omitted); *see Moore*, 1938-NMSC-007, ¶ 73 ("We cannot supplant the conclusions of experts, though unanimous . . . , for the conclusion of the jury's verdict.").

{19} These principles are not at odds. That the jury can reject unanimous expert testimony does not mean that it would be reasonable in every case to do so. Where

there is some basis for disregarding the testimony—for instance, where eyewitness (lay) testimony conflicts with the opinions of psychiatrists and psychologists that a criminal defendant was insane when he committed an offense—it is plainly improper for a court to weigh the evidence and direct a verdict favoring the experts' opinions. *See State v. Dorsey*, 1979-NMSC-097, ¶¶ 10-12, 93 N.M. 607, 603 P.2d 717; *see also Moore*, 1938-NMSC-007, ¶ 55 ("Against the opinion of the doctors, we have testimony showing that the defendant knew what he was doing and why he was doing it.").

{20} But absent any true issues of fact, "[u]ncontradicted evidence, which is not subject to reasonable doubts, may not be arbitrarily disregarded." *Samora v. Bradford*, 1970-NMCA-004, ¶ 16, 81 N.M. 205, 465 P.2d 88. That is the rule even when the movant bears the burden of persuasion at trial. *See* 1 Clifford S. Fishman & Anne T. McKenna, *Jones on Evidence* § 3:43 (7th ed. 2016) ("Although the presumption that uncontradicted [expert] testimony is to be credited can, of course, be trumped by any negative impression that the trier of fact may have on a witness' demeanor, [the trier of fact] cannot act arbitrarily." (omission, internal quotation marks, and citation omitted)).

{21} It is undisputed that Defendants did not require Dr. Pavia, or any physician, to visit Martinez at VNR within forty-eight hours of her admission, after nurses noted

"scabbed pus" at her pacemaker site on May 4, or after she was treated with two doses of narcotic medication for pain at her incision immediately prior to discharge. Indeed, in accordance with the facility's general policy, Dr. Pavia was never required to visit Martinez at VNR. Experts for both sides agreed that this conduct fell below the standard of care. Their testimony was not incredible (the adverse witnesses corroborated one another on the issue); it was not shaken by cross-examination; and it could not have been contradicted by any lay testimony. *Sewell v. Wilson*, 1982-NMCA-017, ¶ 23, 97 N.M. 523, 641 P.2d 1070 ("Expert testimony . . . is required if the alleged negligence is in an area peculiarly within the knowledge of physicians.").

{22}    The district court properly granted a directed verdict with respect to the negligent operation claim, not because there is an inflexible rule that expert testimony can never be disregarded by the jury, but because under these facts, it would have been patently unreasonable for the jury to concoct from nothing its own competing professional standard of care. "The basis for a directed verdict, therefore, [was] the absence of an issue for the jury to resolve." *Melnick v. State Farm Mut. Auto. Ins. Co.*, 1988-NMSC-012, ¶ 11, 106 N.M. 726, 749 P.2d 1105.

**The Negligence Per Se Claims**

{23}    Negligence per se requires, among other things, "a statute which prescribes certain actions or defines a standard of conduct, either explicitly or implicitly[.]"

10

*Heath*, 2008-NMSC-017, ¶ 7 (internal quotation marks and citation omitted). The duty must be defined "with specificity," *id.* ¶ 9, and it must be "distinguishable from the ordinary standard of care." *Thompson v. Potter*, 2012-NMCA-014, ¶ 32, 268 P.3d 57.

{24}    It would be redundant, for example, to instruct the jury on negligence per se based on a regulation imposing an obligation on owners to update or retrofit their property when an existing condition is "dangerous to life." *Heath*, 2008-NMSC-017, ¶¶ 18-19. "[T]he statutory term ['dangerous to life'] adds little if anything to the common law standard of ordinary care because, if property owners have to exercise ordinary care, then obviously they would have to respond to a life-threatening condition." *Id.* ¶ 19. For the same reason, negligence per se is inappropriate for violation of laws that prohibit drivers from following "more closely than is reasonable and prudent" or that make it a crime to "negligently" graze livestock on a fenced highway. *Id.* ¶¶ 20-21 (emphasis, internal quotation marks, and citation omitted) (overruling cases that held the opposite). In all of these examples, the quoted terms effectively restate the ordinary standard of care.

{25}    Similarly, the federal regulation at issue requires only that nursing homes furnishing outside services must enter written agreements with their service providers assuming responsibility for ensuring that the providers meet applicable "professional

11

standards." 42 C.F.R. § 483.75(h)(1), (2)(i). In the words of Plaintiff's expert—a doctor of internal medicine and geriatrics:

> [T]hat's basically a way of saying that the facility has to make sure that if you're, for instance, a physical therapist from the outside, you maintain the standards that physical therapists are supposed to maintain. And, therefore, in this case, the administrator, the director of nursing, the other members of the governing body, including the corporate representative, are to make certain that the facility, meaning, in this case, the administrator, assures that people providing care are meeting their own standards. In other words, a doctor is meeting the doctor standard of care.

Along these lines, Plaintiff argued to the district court that the federal regulation created a mechanism to hold the facility responsible in tort for Dr. Pavia's breach of professional standards by failing to visit Martinez at VNR. That is a dubious interpretation of a regulation that only sets forth conditions for participation in medicare and medicaid programs. *See* 42 C.F.R. § 483.1(b). But the district court, apparently persuaded, directed a verdict in favor of Plaintiff, which ultimately resulted in the following jury instruction:

> The Court has determined as a matter of law that Defendants violated 42 C.F.R. [§ 483.75(h)] that requires the facility itself to assume responsibility for obtaining services that meet professional standards and principles that apply to professionals providing services in such a facility.
>
> You are instructed that such conduct . . . constituted negligence as a matter of law.

12

> You need now determine whether [this or any other admitted liability] contributed to cause damage to . . . Martinez.

This instruction should never have been given because it derived liability from the undefined standard of care applicable in any medical negligence case. *See Heath*, 2008-NMSC-017, ¶¶ 8-9. Worse still, by directing to the jury that Defendants failed to ensure that Dr. Pavia met "professional standards," the court actually determined the medical negligence standard of care as a matter of law, which is a matter normally left to the jury. *See* UJI 13-1101 NMRA.

{26} "But an unnecessary instruction does not necessarily create reversible error." *Abeita v. N. Rio Arriba Elec. Coop.*, 1997-NMCA-097, ¶ 23, 124 N.M. 97, 946 P.2d 1108. In this case, the standard of care was never in doubt. We have already held that the district court properly granted judgment as a matter of law on the negligent operation claim. The result of the district court's error of instructing the jury a second time that Defendant's failure to ensure Dr. Pavia met professional regulatory standards constituted negligence as a matter of law, and then asking the jury to determine whether that conduct caused Martinez's death, was nothing more than a redundant jury instruction that could not have impacted the verdict. That is not a basis for a new trial. *See id.*

{27} As mentioned earlier, Defendants have cited the following language from one of our cases in support of their argument that a new trial is required: "[W]here we

13

cannot tell whether the jury based its verdict upon an improperly submitted issue, the proper procedure is to reverse and remand for a new trial on all issues." *Bachicha*, 1987-NMCA-053, ¶ 16. That language, however, does not remove technically erroneous jury instructions from the ambit of harmless error. *See Kennedy v. Dexter Consol. Sch.*, 2000-NMSC-025, ¶¶ 29-30, 129 N.M. 436, 10 P.3d 115; *see also* Rule 1-061 NMRA ("The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties."). There is no presumption of prejudice where a single claim is severed by the jury instructions into two separate theories of liability—one erroneous and the other not. *See Kennedy*, 2000-NMSC-025, ¶ 30 ("[T]he erroneous [jury] instruction was merely another way to complain of the same act that formed the basis of the claimed illegal search."); *First Nat'l Bank in Albuquerque v. Sanchez*, 1991-NMSC-065, ¶ 14, 112 N.M. 317, 815 P.2d 613 ("[A]lthough stated as a separate theory of liability, the claim of duress seems merely to have been another way to complain of the same act that formed the basis for the claimed breach of contract.").

{28}    That is all that happened here. It would be a mistake of this Court to nullify the result of a six-day jury trial because a negligence per se instruction erroneously restated the uncontroverted medical negligence standard of care, which was not met by any account.

14

{29}    Nor was it reversible error to direct a verdict on the state regulation. There is a dispute on appeal whether Defendants have preserved their argument that Martinez's expected stay of twenty days at VNR constituted "short-term care," which is expressly excepted from the forty-eight-hour examination requirement of 7.9.2.37(C)(1) NMAC. Although Defendants did argue that "New Mexico requirements say[ forty-eight] hours but not if it's a short-term stay[,]" the district court asked Defendants to develop that argument by directing it to any testimony about the definition of a "short-term" stay because it did not "recall any testimony about . . . what the definition of short-term was." Defendants did not direct the court to any such testimony, and there is none in the record.

{30}    Regardless of whether Defendants' argument was preserved, we are as puzzled as the district court because the regulations shed no light on the exception, and the parties have not cited a single authority to assist us in interpreting it. We have the same basic question that the court asked below: What is a short-term stay? It is Defendants' burden as appellants to "clearly demonstrat[e] that the trial court committed error." *Allen v. Amoco Prod. Co.*, 1992-NMCA-054, ¶ 17, 114 N.M. 18, 833 P.2d 1199. They have not done so.

{31}    But even accepting that the state regulation did not apply, there is still no prejudice to Defendants. A potentially erroneous finding of causation based on

15

violation of the forty-eight-hour requirement would mean that the jury also (appropriately) found causation based on the broader allegation that the facility was negligently operated. Together, the federal and state regulation were part of a single claim that the facility failed to adhere to the normal practice of requiring attending physicians to visit their patients on-site, within forty-eight hours *or ever*. Subsumed within that theory, the negligence per se instructions and the directed verdicts that led to them were superfluous. *See Kennedy*, 2000-NMSC-025, ¶¶ 29-30; *Sanchez*, 1991-NMSC-065, ¶ 14.

**Joint and Several Liability**

{32} We next turn to Defendants' argument that Plaintiff needed to pierce the corporate veil to hold them jointly and severally liable. Plaintiff—who has made no attempt to pierce the veil—responds that veil-piercing was not required because (1) there was sufficient evidence of a joint venture between all Defendants, and (2) all Defendants also exercised enough control over PMAL's employees to establish a "co-employment" relationship with the negligent staff at VNR. Plaintiff also says that the jury expressly determined that each Defendant was *directly liable* for Martinez's wrongful death, but we must reject that contention outright because it is impossible

to tell from the special verdict form which Defendants the jury found to be negligent[1] and also because multiple wrongdoers cannot be held jointly and severally liable in New Mexico. NMSA 1978, § 41-3A-1(A) (1987); *see Valdez v. R-Way, LLC*, 2010-NMCA-068, ¶¶ 6-7, 148 N.M. 477, 237 P.3d 1289 (distinguishing vicarious liability, which is faultless). That leaves either joint venture or co-employment as the only potential bases for upholding the verdict.

{33}     "A joint venture is formed when the parties agree to combine their money, property or time for conducting a particular business venture and agree to share jointly in profits and losses, with the right of mutual control over the business enterprise or over the property." *Quirico v. Lopez*, 1987-NMSC-070, ¶ 9, 106 N.M. 169, 740 P.2d 1153. Perhaps the most workable rule is that joint venturers can never conduct their enterprise through the instrumentality of a corporation as the two forms of business are mutually exclusive and governed by different bodies of law. *Weisman v. Awnair Corp. of Am.*, 144 N.E.2d 415, 418 (N.Y. 1957). But that is not the rule everywhere, *see, e.g.*, *Kissun v. Humana, Inc.*, 479 S.E.2d 751, 753 (Ga. 1997), and it is at least conceivable that a parent may share a business venture with its subsidiary. This Court has said as much in a memorandum opinion. *Wrongful Death Estate of*

---

[1] "Question No. 1: Do you believe that any of these acts of negligence by *any . . . Defendants* were a cause of injury and damage to . . . Martinez?" (Emphasis added.)

17

*Archuleta v. THI of N.M., LLC*, No. 31,950, 2014 WL 890613, mem. op. ¶ 48 (N.M. Ct. App. Jan. 9, 2014) (non-precedential).

{34} Defendants formed a chain of ownership: PMAL, which was the licensed operator of VNR (and the undisputed employer of the facility's staff), was a wholly owned subsidiary of Peak Medical, LLC (Peak Medical), which was wholly owned by SunBridge Healthcare, LLC (SunBridge), which was itself wholly owned by Sun Healthcare Group, Inc. (Sun). There was some apparent overlap in corporate officials within the group, and entities up the chain promulgated general policies and provided assistance at VNR for employee conduct, patient care, and regulatory compliance. The most extensive meddling seemed to result from administrative and advisory assistance agreements that PMAL entered into with Sun and SunBridge, pursuant to which the parent entities charged fees from the facility's operating income to draft policies and procedures for VNR, pay its vendors, and manage its account.

{35} There is nothing particularly unusual about that, at least in the abstract. *See* Phillip I. Blumberg, *Limited Liability & Corporate Groups*, 11 J. Corp. L. 573, 623 (1986) ("Within the corporate group, the parent as sole shareholder is almost invariably engaged in the managerial functions of establishing policy, determining budget, providing administrative support, and participating in the decision[]making of the subsidiary corporation."). Stock ownership, as a matter of course, allows a

18

parent to choose its subsidiary's board of directors, make bylaws, and vote on general matters of corporate governance put forth by the board. *See United States v. Bestfoods*, 524 U.S. 51, 61-62 (1998). "Thus it is hornbook law that the exercise of the control which stock ownership gives to the stockholders will not create liability beyond the assets of the subsidiary." *Id.* (omission, internal quotation marks, and citation omitted); *see* Restatement (Second) of Agency § 14M (1958) ("A corporation does not become an agent of another corporation merely because a majority of its voting shares is held by the other."). Likewise in New Mexico, limited liability is the rule and not the exception, *see Scott*, 1988-NMSC-028, ¶ 6, and evidence sufficient to satisfy the elements of joint venture or co-employment within a parent-subsidiary relationship had better be eccentric to the norms of corporate behavior, lest we risk unwittingly eliminating the doctrine of limited liability via the mundane application of ordinary agency principles.

{36} One of the elements of a joint venture is an agreement to share profits and losses. *Quirico*, 1987-NMSC-070, ¶ 9. It is not clear what evidence supports the existence of such an agreement in this case. Plaintiff's brief seems to point to the capture of profits on each Defendant's income statement upstream. That is, of course, entirely ordinary. *Hanback v. GGNSC Southaven, LLC*, No. 3:13-CV-00288-MPM-SAA, 2014 WL 3530613 at *5 (N.D. Miss. July 15, 2014) ("[I]f the capture of

upstream profits constitutes a joint venture, then nearly all formally organized . . . parent/holding companies would be considered part of a joint venture[.]"). And Sun and SunBridge profited from activities at the facility by charging PMAL a fee for administrative assistance. But the administrative assistance agreements could not have established a joint venture; they expressly disclaimed any right of mutual control.[2]

{37} Even if we were to somehow infer a profit-sharing agreement from other evidence, such as VNR's policy manuals and codes of conduct, which are printed with Sun's and Sunbridge's logos, there is certainly no evidence of any agreement to share losses. It is said that the "absence of an express agreement to share losses is not fatal to a determination that the transaction was a joint venture" and that "mutual liability for losses will be implied from an agreement to share profits." *Quirico*, 1987-NMSC-070, ¶ 9. While that is fine as a general matter, it is a poor fit for this case where the upstream Defendants have plainly manifested their intention to avoid loss-

---

[2] See, for example, the agreement between PMAL and Sun:

The Subsidiaries shall remain solely responsible for, and the Administrative Assistance shall not include, the management and operation of the Subsidiaries, including clinical matters, supervision of staff, and the adoption of policies and procedures. Nothing herein shall delegate the control of or ultimate responsibilities of the Subsidiaries to Sun.

sharing by structuring their businesses to limit losses to the extent of their investments downstream. *See Rosenfeld v. Brooks*, 895 S.W.2d 132, 135 (Mo. Ct. App. 1995) ("[I]t is inappropriate for a court to imply a joint venture where . . . it is evident that there is a different business form involved.").

{38} Plaintiff's brief says that the "critical evidence" of a joint venture is that "each entity owned 100 [percent] of the operations" at VNR. That is the same thing Plaintiff told the jury in closing argument:

> Now, the joint venture section of this verdict form is very important. . . . Now, when you look at [the joint venture question], I would tell you to think the easy way, and that is the licensure application. And that is 100 percent of 100 percent is 100 percent. And that is that all four corporations own, manage, control, share 100 percent. And so a check mark for every one of those tells us that you believe those four are in [a] joint venture together.

This was derived from PMAL's application to operate the facility that disclosed its chain of ownership—as required—to the Department of Health. As a matter of law, that document cannot establish a joint venture, or else we would expose to liability every corporate parent of every entity that correctly attaches its ownership information when it fills out a nursing facility licensure application. In fact, only PMAL was authorized by the Department of Health to operate the facility.

{39} The chain of ownership itself is almost certainly what the jury relied upon when it found that all four Defendants were joint venturers. How else can we explain

21

the determination of Peak Medical's liability, for which there was no evidence whatsoever of any right to exercise control over the facility? In the absence of any real evidence of a joint venture, the jury did exactly what Plaintiff asked it to do: It inferred a right of mutual control and a profit/loss-sharing agreement from evidence tending to show a series of ordinary corporate relationships; Peak Medical was swept up with the others.

{40}     Ultimately, the sine qua non of a joint venture is an agreement. *Sheppard v. Carey*, 254 A.2d 260, 263 (Del. Ch. 1969). Because there was not sufficient evidence to prove one—even by inference—Defendants' motion for directed verdict should have been granted.

{41}     With respect to co-employment, we cannot locate any case anywhere (and Plaintiff has not cited one) that has held that, absent veil-piercing, a parent corporation can be vicariously liable in tort as a simultaneous co-employer of its subsidiary's employees. *See Atwood v. Chicago, R.I. & P. Ry. Co.*, 72 F. 447, 455 (C.C.W.D. Mo. 1896) ("It is a doctrine as old as the Bible itself, and the common law of the land follows it, that a man cannot serve two masters at the same time[.]"). The novelty of the issue was evident in a lengthy argument below about the wording of our respondeat superior uniform jury instructions, which are naturally directed at the

relationship between an employee and a single employer. *See* UJI 13-403 NMRA; UJI 13-407 NMRA.

{42} Joint employment theories (with specially formulated multifactor tests) have sometimes arisen from the particular definitions in federal employment and labor statutes, *see, e.g.*, 42 U.S.C. § 2000e-2 (2014); 29 U.S.C. § 206(d)(1) (2016), but even those cases take heed of limited liability and apply "a strong presumption that a parent company is not the employer of its subsidiary's employees[.]" *Frank v. U.S. West, Inc.*, 3 F.3d 1357, 1362 (10th Cir. 1993). *Frank*, for example, held that the "extraordinary circumstances" that would establish a joint employment relationship between parent and subsidiary did not exist, though the parent owned all of its subsidiary's stock, shared a manager in common with its subsidiary, supervised employees of its subsidiary, provided services to its subsidiary, and established general policies governing the overall enterprise. *Id.* at 1362-64.

{43} In this case, co-employment liability was based only on an instruction that asked the jury to apply the "right of control" test that we use to distinguish employees from independent contractors. *See* UJI 13-403 ("An employer is one who has another perform certain work and who has the right to control the manner in which the details of the work are to be done, even though the right of control may not be exercised."). That effectively eschewed any finding of domination or instrumentality that is

23

normally required to hold a shareholder vicariously liable for the torts of corporate employees. *See Morrissey v. Krystopowicz*, 2016-NMCA-011, ¶ 13, 365 P.3d 20. We conclude that there is no viable claim of co-employment liability, at least not in this context, and that judgment as a matter of law should have been granted on that issue as well. To the extent the evidence revealed questionable corporate practices on the part of Sun or SunBridge, Plaintiff was free to seek the equitable relief of veil-piercing, which is a firmly established exception to the general rule that "[s]hareholders can . . . commit limited capital to the corporation with the assurance that they will have no personal liability for the corporation's debt." *Scott*, 1988-NMSC-028, ¶ 6.

{44}     Our conclusion does not reach PMAL. "A corporation can act only through its officers and employees, and any act or omission of an officer or employee of a corporation, within the scope or course of his or her employment, is an act or omission of the corporation." *Bourgeous v. Horizon Healthcare Corp.*, 1994-NMSC-038, ¶ 11, 117 N.M. 434, 872 P.2d 852. There is no dispute that PMAL employed the negligent staff at VNR.

**CONCLUSION**

{45}     We affirm the entry of judgment against PMAL and reverse with respect to all other Defendants. Since we have reversed aspects of the judgment and since the

district court relied, in part, on its view of the complexity of the issues in the case, we think it prudent to remand for the district court to reassess its award of prejudgment interest.

{46}   **IT IS SO ORDERED.**

_____
**LINDA M. VANZI, Judge**

**WE CONCUR:**

_____
**M. MONICA ZAMORA, Judge**

_____
**J. MILES HANISEE, Judge**