**Certiorari Denied, December 12, 2013, No. 34,427**

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number:  2014-NMCA-015**

**Filing Date:  October 21, 2013**

**Docket No. 31,585**

**RICHARD QUINTANA and
BLANCA QUINTANA**,

       **Plaintiffs-Appellants,**

**v.**

**STEVEN ACOSTA, M.D., NOR-LEA
HOSPITAL DISTRICT, and
NOR-LEA GENERAL HOSPITAL,**

       **Defendants-Appellees.**

**APPEAL FROM THE DISTRICT COURT OF LEA COUNTY**
**William Shoobridge, District Judge**

Law Offices of Daymon B. Ely
Daymon B. Ely
Albuquerque, NM

Bette Velarde
Albuquerque, NM

for Appellants

Brown & Gay, P.C.
Remo E. Gay
Albuquerque, NM

for Appellee Acosta

Miller Stratvert P.A.
Thomas R. Mack
Albuquerque, NM

for Appellees Nor-Lea Hospital District & Nor-Lea General Hospital

**OPINION**

**VIGIL, Judge.**

**{1}**      In this medical malpractice case, Defendants moved to exclude the causation opinion of Plaintiffs' expert witness on the basis that the expert was unqualified to give his opinion regarding the efficacy of prophylactic antibiotics and that the testimony was scientific knowledge, which Plaintiffs were unable to establish as reliable.  The district court agreed, excluded the expert's causation opinion, and therefore dismissed the case.  Concluding that the district court erred in ruling that the proposed testimony was scientific knowledge, which requires compliance with *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and *State v. Alberico*, 1993-NMSC-047, ¶ 58, 116 N.M. 156, 861 P.2d 192, we reverse.

**I.      BACKGROUND**

**{2}**      Plaintiff Richard Quintana, who is diabetic, stepped on a nail while working in his yard and suffered a puncture wound to the bottom of his left foot.  Plaintiff did not realize that he had been injured until that night as a result of his diabetes-related peripheral neuropathy.  Peripheral neuropathy causes a loss of sensation in the limbs, such as the feet.  After discovering the injury, Plaintiff went to the Nor-Lea General Hospital Emergency Department, where he was treated by Defendant Dr. Steven Acosta.  The parties dispute the specifics of Dr. Acosta's treatment, but they agree that a nurse cleaned the wound with an antibiotic scrub and that Dr. Acosta administered a tetanus immunization, determined that prophylactic antibiotics were unnecessary at that time, and instructed Plaintiff to monitor the wound for signs of infection and to follow up with his primary care physician the next week.  Dr. Acosta later stated that he did not administer prophylactic antibiotics to Plaintiff because "his wound looked clean," and there was "no active bleeding, no surrounding erythema, [and] no other lesions or discharge."

**{3}**      Despite the written discharge instructions provided to him stating that he was to "[f]ollow up with [his primary care physician] [next] week re:  antibiotics," Plaintiff did not seek a follow-up appointment with his primary care physician.  Six days after his visit to the emergency room, Plaintiff traveled to Mexico, where he experienced a throbbing sensation and pain in his foot and observed drainage from the puncture wound.  Plaintiff was hospitalized in Mexico, where he received intravenous antibiotics consisting of clindamycin and ceftriaxone, vancomycin and ceftriaxone, and vancomycin and imipenem.  Plaintiff returned to the United States to receive medical care at the University of New Mexico Hospital, which culminated in a transmetatarsal amputation of his left foot a month after his initial injury.

**{4}**      Plaintiff and his wife, Blanca Quintana, brought a medical malpractice suit against

2

Dr. Acosta, alleging that Dr. Acosta had "negligently treated [Plaintiff] by . . . failing to prescribe antibiotics, secure an immediate follow up, convey to the patient the importance of his injuries or otherwise act in a reasonable manner for physicians." Plaintiffs also sued the Nor-Lea General Hospital (Hospital) as Dr. Acosta's employer, and the Nor-Lea Hospital District (Hospital District) as the owner and operator of Hospital.

## A.     Plaintiffs' Expert Witness

{5}     Plaintiffs retained Dr. Robert P. Wahl, a board-certified emergency medical physician, as their expert witness. Dr. Wahl presented his conclusions in a report in which he determined that "the essence of this case distills to the management of a puncture wound to the foot and an opinion as to whether antibiotics were indicated in the initial treatment of this patient." Dr. Wahl noted the following factors:

> 1.)     time of the injury: This is not clear from the documentation provided; "early in the day" is the phrase used in the emergency department note. Timing plays a significant role in the potential for wound infection. Wounds untreated for greater than 6 hours have a higher infection rate. Mr. Quintana presented to the emergency department at 7:15 pm to be evaluated. The potential for his wound to be greater than 6 hours old is present.

> 2.)     mechanism/extent of the injury: The mechanism appears to be a puncture wound with a nail through footwear (shoe and sock) to the sole of the left foot/toe. The patient was unaware of the injury likely due to diabetes-related peripheral neuropathy and the potential for deep penetration and/or repeated injury (taking more than one step with the nail punctured through his shoe) was present. Additionally, wounds to the foot through a rubber-soled shoe have an increased rate of infection with Pseudomonas species bacteria. . . .

> 3.)     environment where the injury occurred: Mr. Quintana was gardening at the time of injury. The potential for inoculation of the wound with contaminants from the soil is present. . . .

> 4.)     factors that contribute to an increased risk of infection in wounds: Mr. Quintana is a known diabetic patient, with the anatomic location of the wound being in the lower extremity, and a time delay from injury to treatment, all of which place Mr. Quintana at increased risk for wound infection.

{6}     Dr. Wahl stated that "[g]iven the information provided, assuming this was a puncture wound to the plantar aspect of the left great or second toe, through footwear, with a delay of 'hours' before treatment, in a diabetic patient who had been working in his garden (potential for soil contamination), it is my medical opinion that antibiotics should have been

initiated in the initial course of treatment from the emergency department to reduce the potential for wound infection." By failing to do so, Dr. Wahl testified, Dr. Acosta violated the standard of care. In a subsequent affidavit, Dr. Wahl noted that "the more time organisms have to 'set up shop' in terms of beginning to multiply permits these organisms to do damage if not treated appropriately." Thus, Dr. Wahl concluded, "Dr. Acosta's failure to prescribe antibiotics and his failure to properly instruct his patient reduced [Plaintiff's] chances, as a matter of reasonable medical probability, for a better outcome and specifically reduce[d] the chances of recovering without having his foot amputated."

**B.      Motion to Exclude Dr. Wahl's Opinion Testimony**

{7}      Dr. Acosta filed a motion to exclude the causation opinion of Dr. Wahl. Dr. Acosta first challenged Dr. Wahl as unqualified to render an opinion regarding the effect of prophylactic antibiotics because "Dr. Wahl's expertise in emergency medicine does not . . . make him qualified or competent to render an opinion which is uniquely in the purview of a specialist in infectious disease." Dr. Acosta further challenged Dr. Wahl's opinion on the efficacy of prophylactic antibiotics as unreliable because it "has no support in science/medicine and should, therefore, be excluded[.]"

{8}      Plaintiffs responded that the motion should be denied because "Dr. Wahl's opinion that the administration of prophylactic antibiotics would have resulted in a better outcome is based on his thirty plus years of experience as an ER doctor in a hospital emergency room environment, treating thousands of patients," that "Dr. Wahl's opinions regarding the use of antibiotics are part of his differential diagnosis," and that "[u]se of antibiotics is a necessary part of a board[-]certified emergency room physician's duties."

{9}      The district court granted Dr. Acosta's motion based on its findings of fact and conclusions of law in which it concluded as a matter of law that Dr. Wahl was offering scientific opinions based on scientific knowledge. The district court therefore considered whether the *Daubert-Alberico* factors were satisfied as we applied them in *Parkhill v. Alderman-Cave Milling & Grain Co.*, 2010-NMCA-110, 149 N.M. 140, 245 P.3d 585, *cert. quashed*, 2013-NMCERT-005, 302 P.3d 1162, were satisfied. Concluding that the necessary predicate was not laid for the admission of Dr. Wahl's opinions as scientific evidence, the district court ordered that his opinions be excluded. The district court order states that Dr. Wahl's opinion testimony is to be excluded from trial because "the opinion is subject to the *Daubert/Alberico/Parkhill* analysis and is not reliable or scientifically valid." In addition, the district court order states that Dr. Wahl's opinion is to be excluded "on the basis that it goes beyond the scope of expertise of the average emergency room physician."

**II.      DISCUSSION**

{10}      Plaintiffs challenge the district court's application of the *Daubert-Alberico* analysis to the admissibility of Dr. Wahl's causation opinion. Specifically, Plaintiffs contend that Dr. Wahl's causation opinion is not based on scientific knowledge, but on his knowledge,

4

experience, and training as an emergency room physician and that it is admissible as such. Dr. Acosta, on the other hand, asserts that the district court correctly concluded that Dr. Wahl's causation opinion is both subject to and unreliable under the *Daubert-Alberico* factors. The Hospital and Hospital District similarly argue that "[b]ecause Dr. Wahl's testimony involves scientific medical issues related to medical causation, specifically the cause of [Plaintiff's] infection, the study of bacteria and the use of medical agents and treatment to control his infection, the [district court] appropriately and correctly determined that Dr. Wahl's opinion testimony must meet scientific evidentiary reliability and validity standards and the [district court] properly applied the *Daubert-Alberico* evidentiary analysis." For the reasons which follow, we agree with Plaintiffs.

**{11}** The admission of expert testimony is governed by Rule 11-702 NMRA, which states: "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Thus, the admission of expert testimony depends on three requirements: "(1) that the expert be qualified; (2) that the testimony be of assistance to the trier of fact; and (3) that the expert's testimony be about scientific, technical, or other specialized knowledge with a reliable basis." *State v. Downey*, 2008-NMSC-061, ¶ 25, 145 N.M. 232, 195 P.3d 1244. This case concerns only the first and third requirements.

**{12}** In *Loper v. JMAR*, 2013-NMCA-098, ___ P.3d ___ (No. 31,357, July 3, 2013), we recently addressed our standard of review on appeal in determining whether the foregoing requirements have been satisfied. We said:

> The admission of expert testimony lies in the discretion of the trial court. An abuse of discretion standard of review, however, is not tantamount to rubber-stamping the trial judge's decision, and we are not prevented from conducting a meaningful analysis of the admission of the expert testimony to ensure that the trial judge's decision was in accordance with the Rules of Evidence and the evidence in the case. Moreover, when the trial court applies a wrong legal standard in determining whether evidence is admissible, an abuse of discretion results. Finally, we observe that in light of the liberal approach of our rules of evidence to the admission of evidence and the heightened qualifications of modern day jurors, any doubt regarding the admissibility of expert opinion evidence should be resolved in favor of admission, rather than exclusion.

*Id.* ¶ 18 (internal quotation marks and citations omitted).

**{13}** The question of whether expert opinion involves scientific knowledge presents a question of law, which we review de novo. *State v. Torres*, 1999-NMSC-010, ¶ 28, 127 N.M. 20, 976 P.2d 20; *State v. Aleman*, 2008-NMCA-137, ¶ 6, 145 N.M. 79, 194 P.3d 110.

5

When the testimony involves scientific knowledge, a non-exclusive list of factors, which we refer to as the *Daubert-Alberico* factors, is considered in determining whether the testimony is reliable and, therefore, admissible. These are:

> (1) whether a theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known potential rate of error in using a particular scientific technique and the existence and maintenance of standards controlling the technique's operation; (4) whether the theory or technique has been generally accepted in the particular scientific field; and (5) whether the scientific technique is based upon well-recognized scientific principle and whether it is capable of supporting opinions based upon reasonable probability rather than conjecture.

*State v. Anderson*, 1994-NMSC-089, ¶ 15, 118 N.M. 284, 881 P.2d 29 (internal quotation marks and citation omitted).

**{14}** However, the *Daubert-Alberico* factors apply only when the district court is evaluating the admissibility of scientific testimony. *Torres*, 1999-NMSC-010, ¶ 43. When the expert testimony is non-scientific, but rather, based on the knowledge, training, or experience of the witness, the *Daubert-Alberico* factors do not apply. *Loper*, 2013-NMCA-098, ¶ 38. Nevertheless, the non-scientific testimony must be reliable to be admissible. *Id.* "[W]hen testing the reliability of non-scientific expert testimony, rather than testing an expert's scientific methodology as required under *Daubert* and *Alberico*, the court must evaluate a non-scientific expert's personal knowledge and experience to determine whether the expert's conclusions on a given subject may be trusted." *State v. Torrez*, 2009-NMSC-029, ¶ 21, 146 N.M. 331, 210 P.3d 228.

**{15}** Dr. Wahl's opinion is directed to whether Dr. Acosta's failure to administer prophylactic antibiotics in the emergency room reduced Plaintiff's chance for a better outcome. Our Supreme Court recognizes such a claim. In *Alberts v. Schultz*, 1999-NMSC-015, 126 N.M. 807, 975 P.2d 1279, our Supreme Court stated that a claim for a loss of chance is "predicated upon the negligent denial by a healthcare provider of the most effective therapy for a patient's presenting medical problem," which may consist of "the failure to timely provide the proper treatment." *Id.* ¶ 11. "The injury is the lost opportunity of a better result, not the harm caused by the presenting problem." *Id.* ¶ 21. Such a claim, like any other medical malpractice claim, requires proof by expert testimony of duty, breach, loss or damage, and proximate cause. *Id.* ¶ 17. Specifically addressing proof of proximate cause in a loss-of-chance claim, our Supreme Court noted two differing standards of proof: the "reasonable degree of medical certainty" standard, and the "reasonable degree of medical probability" standard and emphasized that "the standard in New Mexico is proof to a reasonable degree of medical probability." *Id.* ¶ 29.

**{16}** We begin with the first question of whether Dr. Wahl is qualified to render an

6

opinion that Dr. Acosta's failure to prescribe prophylactic antibiotics resulted in a loss of a chance of a better recovery by Plaintiff. Here, the experts on both sides agree that at issue in this case is Dr. Acosta's management of Plaintiff's foot injury and whether antibiotics were indicated in his initial treatment. Dr. Acosta concedes that Dr. Wahl is qualified to testify as to the standard of care required of an emergency room physician in the treatment of a patient like Plaintiff. We agree. Dr. Wahl holds a medical degree from Wayne State University and is licensed to practice in Michigan; he is board-certified in emergency medicine and has practiced emergency medicine for approximately thirty years; he has taught clinical instruction in emergency medicine at his alma mater for twenty-four years; he has a number of published works on various emergency medicine topics in peer-reviewed publications and books; and he has been a guest speaker at a number of emergency medicine meetings and seminars.

**{17}** We next address Plaintiffs' contention that the district court erred in concluding that the admissibility of Dr. Wahl's causation opinion in this case must be analyzed under the *Daubert-Alberico* factors because it is based on scientific knowledge. Again, whether expert testimony involves scientific knowledge presents a question of law, which we review de novo. *Torres*, 1999-NMSC-010, ¶ 28. In its findings and conclusions, the district court determined that "Dr. Wahl's testimony regarding antibiotic treatment is a determination of the external cause of the infection or disease itself and is scientific, as is the medicine and bacteriology that underlies it, and it is therefore subject to [the *Daubert-Alberico*] analysis, and must therefore be reliable under the appropriate evidentiary standards of [*Daubert-Alberico*]." After applying a *Daubert-Alberico* analysis, the district court concluded that "[t]he causation opinion of Plaintiffs' expert witness, Robert P. Wahl, M.D., is excluded from trial on the basis that the opinion is subject to the [*Daubert-Alberico*] analysis and is not reliable or scientifically valid as to assist the [trier] of fact pursuant to that analysis."

**{18}** We disagree. Dr. Wahl's causation opinion does not constitute scientific knowledge and therefore is not subject to a *Daubert-Alberico* analysis. The parties' dispute does not concern the specifics of the external cause of the subsequent infection. Rather, they disagree as to whether the proper course of treatment included administering prophylactic antibiotics and if Dr. Acosta's failure to do so reduced Plaintiff's chances for a better outcome. Dr. Wahl did not testify that administration of prophylactic antibiotics to Plaintiff would have prevented his subsequent infection. Dr. Wahl was asked during his deposition, "Are you able to say that had this patient been treated as you recommended he should have been[,] he would have avoided the complications he had?" Dr. Wahl responded, "No, you can't say that. . . . But you would have given him every reasonable opportunity and chance to limit the potential for complication." Given the concession that Dr. Wahl is qualified to testify about the standard of care, we agree with Plaintiffs that this "includes Dr. Wahl's opinion that Dr. Acosta fell below the standard of care in not prescribing antibiotics—an opinion which by necessity involves an analysis of the efficacy of antibiotics in diabetic patients." Instead of constituting scientific knowledge, we conclude that Dr. Wahl's causation opinion is based on his specialized knowledge regarding the treatment of patients like Plaintiff that is based on his training and experience as an emergency room physician.

7

**III.  CONCLUSION**

**{19}**   The order of the district court is reversed.

**{20}   IT IS SO ORDERED.**

_____
**MICHAEL E. VIGIL, Judge**

**WE CONCUR:**

_____
**JAMES J. WECHSLER, Judge**

_____
**TIMOTHY L. GARCIA, Judge**

**Topic Index for _Quintana v. Acosta_, No. 31,585**

**APPEAL AND ERROR**
Standard of Review

**EVIDENCE**
Exclusion of Evidence
Expert Witness
Scientific Evidence & _Daubert_ Standard

**TORTS**
Medical Malpractice