The slip opinion is the first version of an opinion released by the Chief Clerk of the Supreme Court. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Chief Clerk for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date: <u>August 31, 2022</u>

**No. A-1-CA-38271**

**ESTHER COLLADO, Deceased, by the Personal Representative of the WRONGFUL DEATH ESTATE, MERLINDA PEREA,**

Plaintiff-Appellee/Cross-Appellant,

v.

**FIESTA PARK HEALTHCARE, LLC d/b/a MEDICAL RESORT AT FIESTA PARK (THE); ENCHANTED HEALTH DEVELOPMENT, LLC; and WW MANAGEMENT, LLC,**

Defendants-Appellants/Cross-Appellees.

and

**FIESTA PARK HEALTHCARE, LLC; ENCHANTED HEALTH DEVELOPMENT, LLC; and WW MANAGEMENT, LLC,**

Third-Party Plaintiffs,

v.

**HOMELAND INSURANCE COMPANY OF NEW YORK, a wholly owned subsidiary of ONEBEACON US HOLDINGS COMPANY, INC.,**

Third-Party Defendant.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Nan G. Nash, District Judge Pro Tem**

Pitman, Kalkhoff, Sicula & Dentice, SC
Jeffrey A. Pitman
Benjamin E. Reyes
Milwaukee, WI

Feliz Angelica Rael
Albuquerque, NM

for Appellees

Holland & Hart LLP
Larry J. Montaño
Julia Broggi
Santa Fe, NM

Hogan Lovells
Catherine E. Stetson
Washington, DC

for Appellants

**OPINION**

**WRAY, Judge.**

{1}    Plaintiff, the personal representative of the wrongful death estate of Esther Collado sued Defendants Fiesta Park Healthcare, LLC d/b/a Medical Resort at Fiesta Park (the Medical Resort), Enchanted Health Development, LLC (Enchanted), and WW Management, LLC (WWM), asserting that they were negligent in the care they provided for Mrs. Collado. The jury found that each of the Defendants were negligent and caused injury or damages to Mrs. Collado and allocated a percentage of the negligence to each Defendant. The jury also found that Defendants were engaged in a joint venture.

{2}    After entry of judgment on the jury's verdict, Defendants filed a renewed motion for judgment as a matter of law (JMOL), or in the alternative a new trial, on the joint venture claim. The district court determined that the evidence did not support the jury instruction on joint venture and granted Defendants' motion. The district court did not, however, order a new trial. Instead, the district court amended the judgment "to eliminate the provisions imposing joint and several liability on Defendants for Plaintiff's claims against them."

{3}    Plaintiff and Defendants each appeal the district court's ruling on the posttrial JMOL. Plaintiff argues that the district court erred in granting the motion for JMOL, while Defendants argue that the district court erred in not also ordering a new trial.

Defendants additionally appeal the district court's admission of expert testimony and the evidence supporting aspects of the jury's verdict. We reverse the district court's order granting the JMOL, affirm all other aspects of district court's rulings, and remand for entry of judgment reflecting the jury's verdict.

**BACKGROUND**

{4}	Eighty-eight-year-old Mrs. Collado was admitted to the Medical Resort, a skilled nursing facility, from June 25, 2013 to July 31, 2013, following hip surgery. When Mrs. Collado returned home and her stockings were removed, she had wounds that looked like "a giant, purple, red plum" on both heels. A few days later, a certified wound nurse assessed the wounds and determined that Mrs. Collado had sustained a deep tissue injury (DTI) on both heels. The wounds had extensive necrotic tissue that required frequent and painful debridement treatments and cleaning. Mrs. Collado's health deteriorated, and she died on May 26, 2015.

{5}	Plaintiff brought a wrongful death lawsuit against, in relevant part, the Medical Resort, Enchanted, and WWM and alleged that Defendants were engaged in a joint venture/enterprise while Mrs. Collado was a patient at the Medical Resort. Trial began in January 2019. At trial, Plaintiff presented expert testimony to connect the DTIs Mrs. Collado developed with her death approximately two years later. Dr. Joyce Black, Ph.D., testified that the wounds were likely visible by the time Mrs. Collado was discharged, given that the wounds were at least ninety-six hours old

2

and likely developed because she was not repositioned for "a good six, eight hours, if not longer." Dr. Richard Dupee, M.D., testified that the DTIs led to various medical complications and deconditioning, which shortened Plaintiff's life expectancy and was a cause of her death.

{6} After Plaintiff rested her case, Defendants unsuccessfully moved for JMOL on Plaintiff's joint venture claim. The district court instructed the jury on joint venture, and the jury found all three Defendants were individually liable and that all three Defendants engaged in a joint venture. Posttrial, Defendants again moved for JMOL, or alternatively, for a new trial, on joint venture. The district court granted JMOL and found that

> [n]o evidence was presented at trial that The Medical Resort and WW[M] had any agreement to share profits and losses and none can be inferred. . . . As such, the Court erred when it instructed the jury on joint venture. There were no true issues of fact for the jury to determine.

Because Defendants' joint and several liability arose from the jury's finding that they had engaged in a joint venture, the district court amended the judgment to eliminate joint and several liability, but left intact the jury's individual liability findings against each entity. The parties appeal.

**DISCUSSION**

{7} On appeal and cross-appeal, the parties raise the following issues: (1) whether the district court properly granted the posttrial JMOL on the joint venture claim; (2)

3

whether the district court afforded Defendants the proper remedy after granting JMOL; (3) whether the evidence supported the jury's verdict that found Enchanted and WWM individually liable for a portion of the fault; and (4) whether evidence supporting causation was admissible and sufficient. Because we conclude that the evidence supported the jury's joint venture verdict, we do not address the second issue—the question of remedy. We therefore consider the first, third, and fourth issues in turn.

## I.      The Joint Venture Evidence Supported the Jury's Verdict

{8}      Defendants brought the posttrial motion for JMOL on joint venture pursuant to Rule 1-050(B) NMRA. JMOL after a verdict "is proper only when it can be said that there is neither evidence nor inference from which the jury could have arrived at its verdict" and "is improper if different inferences may reasonably be drawn from the evidence." *Flanary v. Transp. Trucking Stop*, 1968-NMCA-010, ¶ 2, 78 N.M. 797, 438 P.2d 637 (reviewing a judgment notwithstanding the verdict).[1]

> In testing the propriety of a judgment notwithstanding the verdict, the evidence favorable to the successful party, together with all inferences

---

[1] Rule 1-050 was amended in 1999, "primarily to change the familiar terminology of 'directed verdict' and 'judgment [notwithstanding the verdict]' to the single term 'judgment as a matter of law.'" *Valley Bank of Com. v. Hilburn*, 2005-NMCA-004, ¶ 15, 136 N.M. 741, 105 P.3d 294; *see Francis v. Johnson*, 1970-NMCA-079, ¶ 9, 81 N.M. 648, 471 P.2d 682 ("Upon motion for judgment notwithstanding the verdict, the court is governed by the same rules which apply to a motion for directed verdict."). We therefore apply those standards applicable to what Rule 1-050 previously designated as a "directed verdict" or "judgment notwithstanding the verdict" to the JMOL in the present case.

as may be reasonably drawn therefrom, will be accepted as true and all evidence to the contrary will be disregarded.

*Rhein v. ADT Auto., Inc.*, 1996-NMSC-066, ¶ 25, 122 N.M. 646, 930 P.2d 783 (internal quotation marks and citation omitted). We review de novo the district court's grant of Defendants' motion for JMOL. *See Williams v. Mann*, 2017-NMCA-012, ¶ 25, 388 P.3d 295.

**{9}** A motion for JMOL "is an objection to the sufficiency of the evidence to support the jury's verdict." *Perez v. City of Albuquerque*, 2012-NMCA-040, ¶ 11, 276 P.3d 973 (internal quotation marks and citation omitted). The district court concluded, and Defendants argue on appeal, that Plaintiff's evidence did not support the elements of a joint venture between the Medical Resort, Enchanted, and WWM. We turn first to the elements required to establish a joint venture, followed by the sufficiency of the evidence supporting the joint venture claim.

**A.     The Elements of a Joint Venture Claim**

**{10}** This Court "measure[s] the sufficiency of the evidence against the jury instructions given." *State v. Notah*, 2022-NMCA-005, ¶ 7, 503 P.3d 418, *cert. denied* (S-1-SC-39016). While the parties dispute whether the jury should have received the joint venture instruction, they do not dispute that the instruction given was a correct statement of the law. The jury instructions are therefore the law of the case, *see Velasquez v. Regents of N. N.M. Coll.*, 2021-NMCA-007, ¶ 8, 484 P.3d 970, and we begin with the joint venture instruction given by the district court.

> A joint venture is formed when the parties agree to combine their money, property or time for conducting a particular business venture and agree to share jointly in profits and losses, with the right of mutual control over the business enterprise or over the property. A partnership or joint venture may be created or implied by the conduct of the parties. Joint ventures[] may delegate responsibility and control between themselves.

*See Quirico v. Lopez*, 1987-NMSC-070, ¶ 9, 106 N.M. 169, 740 P.2d 1153 (setting forth the elements of joint venture). It is the role of the fact-finder, in contemplating a joint venture, "to ascertain the intention of the parties as disclosed by their acts in connection with the entire transaction." *Id.* ¶ 10. In the posttrial motion for JMOL, Defendants argued that the three entities did not have a mutual right to control and that Enchanted and WWM did not have "a right to share in the profits or duty to share in any loss[es]." Based on the analysis in *Wirth v. Sun Healthcare Group, Inc.*, 2017-NMCA-007, 389 P.3d 295, the district court ruled that the trial evidence failed to establish a joint venture. We disagree and explain, beginning with *Wirth*.

{11}     In *Wirth*, the jury found that four entities were "joint venturers," and this Court considered whether the joint venture issue should have been submitted to the jury. *Id.* ¶ 2. The defendants remaining at the time of trial were a skilled nursing facility "and three upstream entities in its ownership chain." *Id.* ¶ 1. This Court began by looking at the corporate structure of the companies in its analysis of "mutual control" to determine whether there was evidence beyond the typical parent-subsidiary corporate relationship. *See id.* ¶¶ 33-35. The reason for this is grounded in the

general rule that "[a] corporation does not become an agent of another corporation merely because a majority of its voting shares is held by the other," *id.* ¶ 35 (internal quotation marks and citation omitted), and the parent "can generally be held vicariously liable for the subsidiary's acts only by piercing the corporate veil." *Id.* ¶ 16. Accordingly, this Court indicated that the evidence to establish the elements of joint venture "within a parent-subsidiary relationship had better be eccentric to the norms of corporate behavior, lest we risk unwittingly eliminating the doctrine of limited liability via the mundane application of ordinary agency principles." *Id.* ¶ 35.

{12}    As applied to the evidence in *Wirth*, this Court noted that the "chain of ownership" for the four entities showed that the skilled nursing facility was wholly owned by one company, which in turn was wholly owned by a second company, which was wholly owned by a third company. *Id.* ¶ 34. This Court explained that this arrangement was not "particularly unusual" and such relationships often resulted in some degree of shared control as part of normal parent-subsidiary corporate relationships. *Id.* ¶ 35. For this reason, this Court concluded that evidence presented at trial tended to show only a series of ordinary corporate relationships and therefore was insufficient to establish the right to exercise control over the facility. *Id.* ¶ 39.

{13}    The plaintiff's evidence in *Wirth*, regarding the sharing of profits and losses, was also "entirely ordinary" or otherwise could not establish a joint venture. *Id.* ¶¶ 36-37. The plaintiff first argued that the profit-sharing element was satisfied by

7

evidence of each of the defendant's "income statement[s] upstream," but upstream income is normal in that corporate relationship. *Id.* ¶ 36. The plaintiff additionally pointed to profits from administrative fees dictated by management agreements. *Id.* But those agreements "expressly disclaimed any right of mutual control" and could not form the basis for a joint venture. *Id.* The plaintiff additionally failed to provide evidence that an agreement to share losses could be inferred from any profit-sharing agreement. *Id.* ¶ 37. The "upstream" defendants "plainly manifested their intention to avoid loss-sharing" and structured the businesses "to limit losses to the extent of their investments downstream." *Id.* Ultimately, this Court held that the defendants' motion for directed verdict should have been granted, because the evidence and inferences did not support a joint venture, and the jury must have "inferred a right of mutual control and a profit/loss-sharing agreement from evidence tending to show a series of ordinary corporate relationships." *Id.* ¶¶ 39-40.

{14}   In the present case, the district court relied on *Wirth* to rule that the evidence did not support a joint venture, and Defendants' arguments on appeal echo the district court's reasoning. We consider all of the evidence presented at trial[2] to

---

[2]We note that Defendants' briefing focuses only on that evidence that supports its position on appeal, despite arguing that the evidence at trial did not support the joint venture claim. A party challenging the sufficiency of the evidence supporting a verdict, "must provide this Court with a summary of all of the evidence bearing on the finding, including the evidence that supports the trial court's determination, regardless of interpretation." *Aspen Landscaping, Inc. v. Longford Homes of N.M., Inc.*, 2004-NMCA-063, ¶ 28, 135 N.M. 607, 92 P.3d 53.

determine if the analysis set forth in *Wirth* is applicable to the evidence the jury considered.

**B.      The Evidence Relating to Mutual Control of the Entities**

{15}      In granting the JMOL, the district court relied on testimony from Horace Winchester, co-owner and representative of all three entities. Winchester testified that Enchanted was a management company for the Medical Resort, a customary arrangement in the industry. Enchanted and the Medical Resort entered into a management agreement (the Agreement), which Winchester signed on behalf of both entities. Winchester testified that it was customary in the industry to use a management company for efficiency, to free the facility employees from administrative functions, and to permit focus on "operating the building and running the operations of the nursing home." Winchester further testified that WWM was intended to be a payroll company. This arrangement between all the three entities, Winchester testified, "might seem a little odd" but was deliberate and unique to the Medical Resort. Based on this testimony, the district court determined that a skilled care facility partnering with a management company and a payroll company was, in general, normal and not "eccentric," as described in *Wirth*.

{16}      In contrast to the typical parent-subsidiary present in *Wirth*, however, and even accepting Winchester's testimony that the arrangement was normal, a reasonable jury could conclude from other evidence presented in this case that the

9

relationship of the three entity Defendants was "eccentric," *see* 2007-NMCA-007, ¶ 35, and demonstrated mutual ownership and control. *See Williams*, 2017-NMCA-012, ¶ 25 (explaining that in reviewing a JMOL, we resolve "all conflicts in the evidence in the nonmoving party's favor").[3] The Agreement outlined the parties' obligations. For a management fee of 6 percent of monthly gross operating revenues, Enchanted was obligated under the Agreement to select and employ the administrator; had sole authority for daily operation of the facility; and was to coordinate staffing, benefits, financial and insurance matters, facility maintenance and repair, purchase of supplies, food services, and obtaining insurance. The Medical Resort provided the license to operate the facility, agreed to provide some indemnity to Enchanted for losses arising from operation of the Medical Resort, and was required to purchase general liability insurance for Enchanted. The Agreement expressly stated that the entities were not engaged in a joint venture and explicitly prohibited Enchanted from assigning or transferring its duties.

---

[3] Defendants contend that to establish a joint venture among the Medical Resort, Enchanted, and WWM, Plaintiff had to prove a right to control "the nursing care." They cite *Heritage Housing Development, Inc. v. Carr*, 199 S.W.3d 560 (Tex. App. 2006). We decline to rely on *Carr*. First, as Defendants note, *Carr* did not consider the issue before us. *See id.* at 566 ("[N]one of the parties contended that a joint venture existed."). Second, Defendants provide no New Mexico authority that requires a party to establish "control over the details of the employees' work," *see id.*, in order to satisfy the mutual control element of the joint venture test. *Cf. Quirico*, 1987-NMSC-070, ¶ 9 (describing "the right of mutual control over the business *enterprise* or over the property" (emphasis added)).

{17} Yet, notwithstanding the Agreement's prohibition against assignment, Winchester's testimony outlined that WWM performed many—if not all—of the functions that the Agreement had delegated to Enchanted. In June and July 2013, WWM essentially provided both payroll and management services to the Medical Resort. Winchester testified that Enchanted had no employees and explained that WWM provided payroll, accounts payable, and human resources services. The parties appear to agree that WWM received the 6 percent management fee set forth in the Agreement, amounting to $505,497, during time that Mrs. Collado was a patient at the Medical Resort. Winchester met with Daniel Barber, the Medical Resort administrator, monthly to discuss the financial performance of the Medical Resort, revenue, expenses, and budget. Buffy Johnson, the vice president of WWM, oversaw the nursing facilities' operations, budget, quality assurance, and she worked with the administrator.

{18} Lance Youles, Plaintiff's expert in nursing home administration and management, testified that Defendants had common ownership and control over the entities. Youles testified that in reality, the Medical Resort performed the functions contractually delegated to Enchanted and purportedly performed by WWM, further undermining Winchester's testimony. From this evidence, although the Medical Resort contracted with Enchanted to perform certain duties, WWM was paid the contractual fee and performed some of the duties, and the Medical Resort actually

11

performed many of the duties. Whether the jury relied on Winchester, Youles, or a combination of both, from the totality of the evidence, the jury could reasonably find Defendants agreed to mutual ownership and control.

## C.      Agreement to Share Profits and Losses

{19}      The district court, again relying on *Wirth*, determined that no agreement to share profits and losses existed among Defendants because (1) the Agreement "eschewed" a joint venture; (2) no agreement to share losses could be inferred because Enchanted would be paid a fee regardless whether the Medical Resort made a profit; and (3) the fee paid to WWM did not demonstrate an agreement to share both profits and losses. Again, Defendants embrace this analysis on appeal.[4] We

---

[4]Defendants maintain that no agreement to share profits existed because the Agreement was for a share of revenue, which Defendants define as "the total amount of money that a business brings in, before any expenses are taken out," as opposed to "profit" or "the amount that remains *after* the business's expenses are paid." The management fee, Defendants argue, would have been paid out of revenue as an expense so that even if the Medical Resort made no profit, the fee would be paid. Defendants' briefing does not assert that this legal argument, about the definition of profit, was made before the jury reached the verdict. Defendants' midtrial motion for JMOL simply stated that none of the evidence Plaintiff produced "established the elements necessary to find a [j]oint [v]enture." Defendants did not develop the argument further at the midtrial hearing, nor did Defendants seek an instruction defining "revenue." It was not until the posttrial JMOL motion that Defendants argued that the evidence failed to satisfy a particular definition of "profit." *See Sandoval v. Baker Hughes Oilfield Operations, Inc.*, 2009-NMCA-095, ¶ 56, 146 N.M. 853, 215 P.3d 791 ("Generally, a motion for a new trial cannot be used to preserve issues not otherwise raised during the proceedings."). Because Defendants did not raise this legal argument before the case was submitted to the jury, we do not consider it further.

12

disagree that the circumstances of *Wirth* provide guidance for the present case. Unlike in *Wirth*, the evidence in the present case did not show an "entirely ordinary" upstream income flow. *See* 2017-NMCA-007, ¶ 36. Instead, the evidence demonstrated that Enchanted had a contractual right to a fee based on a percentage of the Medical Resort's revenue, which was paid instead to WWM.

{20}    Defendants' argument suggests that for a joint venture to exist, the parties must not only share jointly, they must share *equally*. But the "sine qua non of a joint venture is an agreement." *Wirth*, 2017-NMCA-007, ¶ 40; *see Durham v. Sw. Devs. Joint Venture*, 2000-NMCA-010, ¶ 3, 128 N.M. 648, 996 P.2d 911 (describing a joint venture agreement that allocated different percentage interests to the partners). Rather than requiring a specific type of agreement regarding profits, the joint venture analysis imposes a duty on the fact-finder "to ascertain the intention of the parties as disclosed by their acts in connection with the entire transaction." *Quirico*, 1987-NMSC-070, ¶ 10. Viewed in this light, the jury could reasonably conclude that Defendants agreed to share resources to operate the facility and the goal of both was to make money from the endeavor—to engage in a joint venture for profit. *See id.* Considering the entire transaction, the evidence was sufficient for the jury to conclude "that it was the intention of the parties to engage in a joint venture for profit" and to infer agreement to share losses. *See id.*

{21} The jury could reasonably infer that if the Medical Resort brought in more money, Enchanted and/or WWM[5] would be entitled to more money and conversely, if the Medical Resort brought in less money, Enchanted and/or WWM would be entitled to less money. The goal of the three entities was to make money, as Johnson, a WWM employee and vice president of the Medical Resort, testified, "I'm running a business. You have to watch your numbers. I don't think a prudent business person just doesn't watch how much money they're putting out versus how much money is coming in. You have to make good business decisions and prudent decisions." The jury could reasonably conclude that the facts of the entire transaction did not resemble a typical contract-fee-for-services agreement, but rather an agreement among the three Defendants that the entities would share resources in order to make money. *See id.*

{22} Because we examine the entire transaction, the provision of the Agreement disclaiming the creation of a joint venture does not control our—or the jury's—analysis. In determining whether a partnership exists, we consider not what the parties name the relationship, but how the facts and circumstances reasonably define the relationship. *See Chevron Oil Co. v. Sutton*, 1973-NMSC-111, ¶ 4, 85 N.M. 679,

---

[5]We include WWM in the analysis related to the Agreement because, although no written contract existed with WWM, (1) Winchester testified that an "informal" agreement existed between Enchanted and WWM to contract services, and (2) the Medical Resort paid to WWM the contractual management fee owed to Enchanted.

515 P.2d 1283 (observing in the agency context that "the majority rule is that the manner in which the parties designate a relationship is not controlling"). The jury was instructed that "[a] partnership or joint venture may be created or implied by the conduct of the parties." Defendants were free to point to the provision of the Agreement that disclaimed any joint venture, but the jury was free to rely instead on the evidence of the parties' conduct.

{23}     We emphasize that a percentage share of revenue, alone, does not establish a joint venture. *See* NMSA 1978, § 54-1A-202(c)(2) (1996) (explaining that "the sharing of gross returns *does not by itself* establish a partnership, even if the persons sharing them have a joint or common right or interest in property from which the returns are derived" (emphasis added)); *see also Wirth*, 2017-NMCA-007, ¶ 36 (acknowledging potential profit-sharing through contractual fees but rejecting the joint venture claim because the contract disclaimed mutual control). The evidence must demonstrate that the parties agreed to "to combine their money, property or time for conducting a particular business venture and agree to share jointly in profits and losses, with the right of mutual control over the business enterprise or over the property." *Wirth*, 2017-NMCA-007, ¶ 33 (internal quotation marks and citation omitted). Put another way, the evidence must show at least an inference "to the effect that it was the intention of the parties to engage in a joint venture for profit." *Quirico*, 1987-NMSC-070, ¶ 10.

{24} Our role in reviewing this postjudgment JMOL is to view the evidence in favor of the jury's findings. *See Rhein*, 1996-NMSC-066, ¶ 25. The evidence, viewed in this manner, supported the jury's finding that the parties agreed to combine resources to conduct a particular business venture for profit and had a right to mutual control. We therefore reverse the district court's order granting Defendants' posttrial motion for JMOL. We next turn to consider whether substantial evidence supported the jury's finding of individual liability as to Enchanted and WWM.

## II. The Evidence Supported the Individual Liability of Enchanted and WWM

{25} To review the jury's verdict for substantial evidence, "we examine the record for relevant evidence such that a reasonable mind might accept as adequate to support a conclusion [and] resolve disputed facts in favor of the party prevailing below, indulging all reasonable inferences in favor of the verdict and disregarding contrary inferences." *Nava v. City of Santa Fe*, 2004-NMSC-039, ¶ 10, 136 N.M. 647, 103 P.3d 571 (internal quotation marks and citations omitted). We "do not independently weigh conflicting evidence." *Id.* (internal quotation marks and citation omitted). As with the joint venture claim, the content of the negligence-related jury instructions is unchallenged, so we "apply the law set forth in the jury instructions." *See Velasquez*, 2021-NMCA-007, ¶ 8.

16

{26} The jury was instructed that Plaintiff claimed "Defendants were negligent in the care and treatment of [Mrs.] Collado which resulted in [DTIs] and her wrongful death" and that Defendants were negligent by failing to provide qualified and sufficient staff to care for Mrs. Collado to develop and implement appropriate policies and procedures, and to administer and manage the facility. "Negligence" was defined as follows:

> The term "negligence" may relate to either an act or a failure to act.
>
> An act, to be "negligence," must be one which a reasonably prudent [s]killed [n]ursing [f]acility would foresee as involving an unreasonable risk of injury to another and which such a reasonably prudent [s]killed [n]ursing [f]acility, in the exercise of ordinary care, would not do.
>
> A failure to act, to be "negligence," must be a failure to act which one is under a duty to do and which a reasonably prudent [s]killed [n]ursing [f]acility, in the exercise of ordinary care, would do in order to prevent injury to another.

On causation, the jury was instructed that "cause" is defined as follows:

> An act or omission is a "cause" of harm if it contributes to bringing about the harm. It need not be the only explanation for the harm, nor the reason nearest in time or place. It is sufficient if it occurs in combination with some other cause to produce the result. To be a "cause," the act or omissions, nonetheless, must be reasonably connected as a significant link to the harm.

Defendants argue that the evidence failed to establish that Enchanted and WWM owed any duty to Mrs. Collado or that a duty was breached or caused her injury or death. We disagree.

17

{27} Beginning with duty, "New Mexico courts have long held that duty is a matter of law to be determined by the court." *Lopez v. Devon Energy Prod. Co., L.P.*, 2020-NMCA-033, ¶ 16, 468 P.3d 887. We therefore again turn to the relevant portions of the district court's instruction on duty:

> In providing care to a patient or guest, a [s]killed [n]ursing [f]acility is under a duty to use ordinary care to avoid or prevent what a reasonably prudent person would foresee as an unreasonable risk of injury to another. A [s]killed [n]ursing [f]acility that fails to do so is negligent.
>
> "Ordinary care" is that care which a reasonably prudent person would use in the conduct of the person's own affairs. What constitutes ordinary care varies with the nature of what is being done. As the risk of danger that should reasonably be foreseen increases, the amount of care required also increases. In deciding whether ordinary care has been used, the conduct in question must be considered in light of all the surrounding circumstances.
>
> In providing care to a patient or guest, a [s]killed [n]ursing [f]acility is under a duty to possess and apply the knowledge and to use the skill and care ordinarily used in reasonably well-operated [s]killed [n]ursing [f]acilities under similar circumstances, giving due consideration to the locality involved. A [s]killed [n]ursing [f]acility that fails to do so is negligent.

The jury instructions outlined laws and regulations regarding sufficient staffing, documentation, DTIs, policies and procedures, licensing, and patient assessments. Defendants do not argue that these instructions were incorrect statements of the law, and Youles testified that the holder of an operating license for a skilled nursing facility has the ability to delegate the management of the facility to a third party and that the state holds the *licensee* responsible for those facility management

18

requirements. We therefore conclude that the jury was properly instructed on the duties owed by Defendants in the present case and the standard of care, and that expert testimony connected those duties to Enchanted and WWM.

{28}    In the context of these duties, the jury could reasonably determine that Enchanted and WWM were negligent. The evidence supported a conclusion that staffing and quality assurance were inadequate and a cause[6] of the injuries and damages to Mrs. Collado. The Medical Resort contracted with Enchanted for Enchanted to perform the Medical Resort's management-related duties—to coordinate, supervise, and assess "adequate staff." Enchanted, however, had no employees. Youles testified that he had "no idea" how Enchanted, "a company with no employees would be able to manage a skilled nursing facility like [t]he Medical Resort." Indeed the evidence showed that the management duties were spread between WWM and the Medical Resort to the extent that responsibility for particular functions was unclear.

{29}    Youles testified that Barber, the Medical Resort nursing home administrator, should have had the responsibility to ensure adequate staffing but did not. Youles additionally testified that Buffy Johnson (a WWM employee and former president

---

[6]We address, in the next section, the admissibility and sufficiency of the causation testimony linking Mrs. Collado's DTIs to her ultimate deterioration and death. For purposes of this discussion, we consider only whether the evidence sufficiently connected the inadequacies in staffing and quality assurance to Mrs. Collado developing DTIs.

of operations for the Medical Resort) "also made those determinations," and "[b]ased on [his] analysis, the administrator did not have that control [over staffing]. It was either at the corporate level, with . . . Johnson, or the owners." Johnson (again, a WWM employee) confirmed that she was responsible for overseeing the facility operationally, for addressing staffing issues, and for quality assurance, including looking "generally at every department and doing a broad overview to make sure that they're following guidelines, compl[ying] with policies, [and] good practices are being conducted." Youles testified that the "governing body"—Winchester (a WWM owner/employee and a Medical Resort owner) and Williamson (a WWM and a Medical Resort owner)—was responsible for implementing policies and procedures related to staffing and that those policies were inadequate and "irresponsible." After reviewing the staffing plans, Youles testified, "There weren't enough nurses. Sometimes two nurses for three shifts—or three units." Youles explained that staffing determines resources and "[r]esources really determine quality of care." Jaime Schwingel, Plaintiff's skilled nursing facility standards expert, testified to numerous violations of the standard of care involving Mrs. Collado, including the development of care plans, documentation, and following physician orders. Specifically, no documentation indicated adherence to physician orders requiring checking or repositioning the patient, Mrs. Collado.

{30} Plaintiff's expert on heel pressure injuries, Dr. Black, testified that to avoid Mrs. Collado's injuries, "all that needed to be done was to elevate her heels off the bed," which should have been—but was not—provided for in the care plan and risk assessment process. The jury heard evidence that the medical record indicated Mrs. Collado was not turned or repositioned during significant periods of time. From this evidence, a reasonable jury could infer that Defendants failed to ensure quality assurance standards were met and that staffing was adequate and those failures were a cause of Mrs. Collado's heel pressure injury.

{31} Accordingly, the evidence supported the jury's findings that Enchanted was 10 percent and WWM was 20 percent liable for the injuries and damages, and we therefore affirm the jury's verdict.

**III.    The Evidence on Causation Was Admissible and Sufficient to Support the Jury's Verdict**

{32} Defendants seek a new trial, arguing that Plaintiff's causation expert, Dr. Dupee, offered unreliable, unsubstantiated, and unhelpful opinions regarding causation. Our Supreme Court has recently reiterated that motions for a new trial are reviewed for abuse of discretion. *See Morga v. FedEx Ground Package Sys., Inc.*, 2022-NMSC-013, ¶ 13, 512 P.3d 774 (explaining that the Court would not deviate from the long-standing practice of reviewing motions for new trial for abuse of discretion). Similarly, "[t]he admission of expert testimony lies in the discretion of the [district] court." *Loper v. JMAR*, 2013-NMCA-098, ¶ 18, 311 P.3d 1184. "[A]ny

doubt regarding the admissibility of expert opinion evidence should be resolved in favor of admission, rather than exclusion." *Id.* (internal quotation marks and citation omitted). The jury, not the judge, performs "[t]he evaluation of competing theories, whether they *equally* support several hypotheses." *Rhein*, 1996-NMSC-066, ¶ 28.

{33} Rule 11-702 NMRA sets forth three requirements for the admissibility of expert testimony: "(1) that the expert be qualified; (2) that the testimony be of assistance to the trier of fact; and (3) that the expert's testimony be about scientific, technical, or other specialized knowledge with a reliable basis." *Loper*, 2013-NMCA-098, ¶ 19 (internal quotation marks and citation omitted). Defendants focus their arguments on the second and third factors. Regarding the second factor in *Loper*, "[i]f an opinion is not is sufficiently tied to the facts in the case, it will not assist the jury in resolving a factual dispute in the case." *Id.* ¶ 25. Whether testimony satisfies the third factor depends on the source of the offered expertise. The United States Supreme Court has set forth an exacting standard for expert testimony that applies to both scientific testimony and opinions based on experience and training. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993); *Kumho Tire Co. v. Carmichael*, 524 U.S. 936 (1998); *see also Acosta v. Shell W. Expl. & Prod., Inc.*, 2016-NMSC-012, ¶ 25, 370 P.3d 761 (describing the federal standards). New Mexico courts apply the *Daubert* standard to scientific testimony, *see State v. Yepez*, 2021-NMSC-010, ¶ 22, 483 P.3d 576, but if the expert's testimony is based on

22

experience and training, "the court must evaluate a non-scientific expert's personal knowledge and experience to determine whether the expert's conclusions on a given subject may be trusted." *State v. Torrez*, 2009-NMSC-029, ¶ 21, 146 N.M. 331, 210 P.3d 228.

{34} Defendants contend that (1) Dr. Dupee's opinion did not assist the trier of fact because it was premised on a vague and unscientific notion of "loss of reserve" and gave too little weight to Plaintiff's comorbidities and preexisting conditions; and (2) the district court erred when it declined to apply the *Daubert* factors for the admissibility of scientific evidence to Dr. Dupee's opinions. Defendants additionally argue that Plaintiff failed to provide sufficient evidence to connect Mrs. Collado's heel injury to her death in light of Defendants' expert's testimony that her death "was the result of 'clear-cut cardiac etiology.'" Based on our review of the trial evidence, Dr. Dupee's testimony assisted the jury and was appropriately based on his knowledge and training.

{35} To determine whether Dr. Dupee's testimony would assist the trier of fact, we review the opinions presented for relevance. *See Loper*, 2013-NMCA-098, ¶ 25 (examining whether the opinions were "tied to the facts of the case and therefore relevant"). Defendants contend the present case resembles *Granbury Hospital Corp. v. Hosack*, No. 10-09-00297-CV, 2010 WL 1712700 (Tex. App. Apr. 28, 2010). That case involved a patient who developed pressure ulcers and died six weeks later.

*Id.* at *2. The court determined that the plaintiff's expert reports were too conclusory and speculative to establish causation, because the report did not explain how the pressure ulcers related to the patient's ultimate death from cardiorespiratory arrest. *Id.* at *3. In the present case, however, Dr. Dupee's testimony sets forth sufficient explanation to support his causation opinions.

{36}   Based on his experience and review of Mrs. Collado's medical records,[7] Dr. Dupee testified that Mrs. Collado's DTIs, specifically the left heel, hindered her ability to regain mobility following the hip surgery. A physician's order directed Mrs. Collado to avoid walking until the DTIs were healed, but as a result of avoiding walking, she continued to lose physical conditioning and rehabilitation became increasingly difficult. Dr. Dupee explained that the sooner elderly patients begin walking after surgery, the more likely they will be able to return to their previous level of physical functioning. By September 7, 2013, Mrs. Collado's legs exhibited "marked deconditioning." Mrs. Collado eventually developed sepsis from an infection in her left heel, which led to potential inflammation in the brain, and in turn caused impaired cognition and lethargy. As Mrs. Collado continued to physically weaken, she was diagnosed with "failure to thrive" and suffered from impaired swallowing and required a G-tube to receive nourishment. She continued to suffer

---

[7]Defendants do not dispute that Dr. Dupee was properly qualified as an expert in geriatrics, infectious disease, and medical causation.

recurrent complications stemming from infection and deconditioning, physical therapy was discontinued, and she required a Hoyer Lift to transfer her in and out of bed. In the last few weeks of her life, Mrs. Collado developed viral pneumonia, which restricted her ability to breathe and fatally stressed her heart. Mrs. Collado's death certificate lists congestive heart failure as a cause of death. Dr. Dupee opined that geriatric patients generally have a decreased ability to withstand an onslaught of medical complications, and the pressure ulcer that Mrs. Collado developed while a patient at the Medical Resort led to these further complications because it left her in an extremely weakened state with limited ability to withstand additional stressors.

{37}     Dr. Dupee acknowledged Mrs. Collado's comorbidities and that she had been diagnosed with diabetes, dementia, osteoporosis, aortic stenosis, and congestive heart failure. While these conditions "participated in" Mrs. Collado's death and were relevant to her life expectancy, her other conditions were "relatively stable" and Dr. Dupee testified that her life expectancy would have been longer without the DTIs. Based on his experience of forty-five years with patients "just like" Mrs. Collado, Dr. Dupee concluded that without the pressure ulcers, Mrs. Collado would have likely lived another three to five years, as opposed to less than two years. Having reviewed the testimony, we conclude that Dr. Dupee's causation and life expectancy opinions "are sufficiently grounded in the facts of the case," relevant, and of assistance to the jury. *See Loper*, 2013-NMCA-098, ¶ 31.

{38} We next turn to Defendants' contention that a determination of life expectancy and cause of death requires scientific evidence that is subject to a reliability determination under *Daubert*. "[W]hether expert opinion involves scientific knowledge presents a question of law, which we review de novo." *Quintana v. Acosta*, 2014-NMCA-015, ¶ 13, 316 P.3d 912. In order to determine whether particular expert testimony is scientific, we consider the nature of the legal and factual dispute that the expert testimony is being offered to resolve. *See id*. ¶ 18.

{39} Defendants argue that "[d]etermining the cause of disease or death can be a complex process requiring specialized scientific knowledge, and in such situations, a physician's expert opinion on causation is subject to standards of scientific reliability." For support, Defendants cite *Acosta*, 2016-NMSC-012, ¶ 35; *Parkhill v. Alderman-Cave Milling & Grain Co. of N.M.*, 2010-NMCA-110, ¶ 35, 149 N.M. 140, 245 P.3d 585; *Firstenberg v. Monribot*, 2015-NMCA-062, ¶ 27, 350 P.3d 1205; *R.R. ex rel. Stowell v. Dandade*, No. 34,998, mem. op. (N.M. Ct. App. Apr. 25, 2017) (nonprecedential). Each of these cases involved a factual dispute that required scientific expert testimony to "show that a suspected cause actually is capable of causing a particular injury or condition in the general population." *Acosta*, 2016-NMSC-012, ¶ 29 (internal quotation marks and citation omitted); *see also id.* ¶ 40 (determining that the expert testimony established a causal "association between [a] chemical exposure and [the p]laintiff's diseases"); *Parkhill*, 2010-NMCA-110, ¶ 32

26

(describing the dispute to be resolved by the rejected expert testimony as whether the plaintiff's "illnesses were caused by their exposure" to a particular chemical); *Firstenberg*, 2015-NMCA-062, ¶ 1 (explaining that the factual dispute was whether the defendant neighbor's use of electronic devices in her home adversely affected the plaintiff's health); *Stowell*, No. 34,998, mem. op. ¶ 6 (identifying the factual dispute as whether a particular medication taken during pregnancy could cause a neurodegenerative disorder). For expert testimony to be relevant to the factual disputes in these cases, the testimony had to connect the exposure to chemical compounds to a medical injury, and the connection between the two had to be based on reliable science. But, in the present case, the specific nature of the disputes could be determined based on the experience and training of a qualified medical expert. One of the factual disputes that Dr. Dupee's testimony was meant to address was whether the heel injury Mrs. Collado developed while at the Medical Resort (a medical cause) was a cause of her death (a medical injury). Dr. Dupee's undisputed experience and training in geriatrics, infectious disease, and medical causation was sufficient to establish that the "suspected cause"—the heel injury—"actually is capable of causing a particular injury or condition in the general population." *Acosta*, 2016-NMSC-012, ¶ 29 (internal quotation marks and citation omitted). As a result, Dr. Dupee's opinions were not subject to *Daubert* and were admissible based on his experience and training. *See Torrez*, 2009-NMSC-029, ¶ 21 (requiring the court to

27

"evaluate a non-scientific expert's personal knowledge and experience to determine whether the expert's conclusions on a given subject may be trusted").

{40} Similarly, Defendants argue that Dr. Dupee's opinion that the heel injuries shortened Mrs. Collado's life expectancy is scientific, "expert testimony regarding whether, based on the plaintiff's specific health factors, her life expectancy was above or below that of an average person her age." In each of the cases Defendants cite, the federal courts have applied the *Daubert* standard to determine admissibility regardless whether the expert's testimony is scientific or based on experience and training. *See Holesapple v. Barrett*, 5 F.App'x 177, 179-80 (4th Cir. 2001); *Gallardo v. United States*, No. 10-cv-00868-PAB-CBS, 2012 WL 1191864, at *1 (D. Colo. Apr. 10, 2012); *Hart v. Corr. Corp. of Am.*, No. 2:11-CV-00267 MCA/WPL, 2014 WL 12670944, at *2-4 (D.N.M. May 6, 2014); *Fisher v. United States*, No. C09-5146 BHS, 2010 WL 3835188, at *1 (W.D. Wash. Sept. 28, 2010). As we have explained, New Mexico has rejected that approach. *See Acosta*, 2016-NMSC-012, ¶ 15. Defendants' remaining authority establishes that the admission of expert testimony is subject to the district court's discretion, *see Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 139 (1997), and that *Daubert* does not require courts to "admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Id.* at 146. However, *Joiner* immediately followed this sentence with the caution that "[a] court may conclude that there is simply too great an analytical gap between the

28

data and the opinion proffered." *Id.* Our Supreme Court, in *Acosta*, rejected the "analytical gap" approach to expert testimony in favor of long-standing New Mexico law placing "great value on allowing a jury to hear evidence and decide a case on the merits." 2016-NMSC-012, ¶¶ 26-28. Ultimately, these cases, like those Defendants cited to challenge Dr. Dupee's causation opinion, generally consider the facts of the dispute and whether the expert's testimony would link the science to the facts. *See Joiner*, 522 U.S. at 143-47 (considering studies offered to link cancer to chemical exposure); *Holesapple*, 5 F.App'x at 179-80 (evaluating whether the expert's weather-related opinions were based on weather-related scientific data); *Hart*, 2014 WL 12670944, at *5-6 (considering a dispute about whether "the administration of the pneumococcal vaccine is a necessary factor to be considered when examining the adequacy of diabetic care"). Dr. Dupee's causation opinion, however, was grounded in his review of the specific evolution of Mrs. Collado's medical condition, the entirety of which was within his experience and training.

{41}     Defendants cite a single case, *Fisher*, for the proposition that life expectancy is inherently scientific and must be subject to *Daubert*'s reliability determination.[8] In *Fisher*, the defendant engaged an expert who held medical and law degrees, but

---

[8]In the reply brief, Defendants additionally cite *Gallardo*, which considers a life expectancy opinion, but the court focused primarily on the plaintiff's failure to disclose the expert's opinion pursuant to the Federal Rules of Civil Procedure. 2012 WL 1191864, at * 4-5.

had never practiced medicine and described himself as "a medical researcher who studies life expectancy, causes of death, and other epidemiological topics." 2010 WL 3835188, at * 2 (internal quotation marks and citation omitted). The expert had developed his own method for calculating life expectancy, which he admitted could not be tested, had not been peer reviewed, and was not subject to error calculation. *Id.* at * 3. Dr. Dupee, on the other hand, testified that he had been "doing this for almost [forty-five] years, and [he had] many patients just like this[, and he] felt she would be able to live at least another three to five years." On cross-examination, he clarified that absent the hip fracture that caused Mrs. Collado to become a patient at the Medical Resort, her life expectancy would have been "[p]robably about the same [but] probably closer to the five years." This testimony lined up with the uniform jury instruction on life expectancy that the district court gave, apparently without objection from Defendants. *See* UJI 13-1831 NMRA. Dr. Dupee's life-expectancy opinion was based on his experience and training, and after reviewing the record, we cannot say the district court abused its discretion in admitting the testimony.

**{42}** Defendants last argue that the causation evidence that was presented was insufficient to support the verdict. Specifically, Defendants contend that Plaintiff's evidence did not overcome Defendants' expert testimony that the cause of death was "of 'clear-cut cardiac etiology.'" The jury, however, was free to reject Defendants' expert testimony. *See Sandoval*, 2009-NMCA-095, ¶ 41 (refusing to consider an

30

opposing expert's opinion to support an argument for lack of substantial evidence). Further, regardless whether Defendants make this sufficiency argument contingent on the inadmissibility of Dr. Dupee's testimony or separately contend that the admitted evidence was insufficient, applying the well-established standard of appellate review and our examination of the causation evidence, we cannot agree. *See Nava*, 2004-NMSC-039, ¶ 10; *Sandoval*, 2009-NMCA-095, ¶ 41.

**CONCLUSION**

{43}     For the reasons set forth herein, we reverse the district court's grant of Defendants' JMOL on joint venture, and affirm the admission of expert testimony and the jury's verdict. We remand for reinstatement of the original judgment.

{44}     **IT IS SO ORDERED.**


_____

**KATHERINE A. WRAY, Judge**

**WE CONCUR:**


_____

**MEGAN P. DUFFY, Judge**


_____

**MICHAEL D. BUSTAMANTE, Judge, retired, sitting by designation**

31